NO. 07-01-0396-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

MARCH 19, 2003
_____

REPUBLIC UNDERWRITERS INSURANCE COMPANY,

Appellant

v.

MEX-TEX, INC.,

Appellee
_____

FROM THE 108TH DISTRICT COURT OF POTTER COUNTY;

NO. 86,842-E; HON. ABE LOPEZ, PRESIDING
_____

OPINION

_____

Before JOHNSON, C.J., and QUINN and REAVIS, JJ.

"Oh, but if we could just say what we mean and mean what we say." The dispute before the court involves the interpretation of an insurance policy and the insurer's liability for purportedly failing to abide by it. The players consist of the insured, Mex-Tex, Inc. (Mex-Tex), and the insurer, Republic Underwriters Insurance Company (Republic). The former sued the latter for breach of contract, breach of the duty of good faith and fair dealing, committing unfair claim settlement practices, and failing to settle the claim within

statutorily prescribed limits. The damages sought included the sum it believed it was entitled to under the insurance policy, a sum necessary to recompense the corporation's mental anguish, and a statutory penalty of 18% of the amount payable under the policy. The dispute was tried to the court, which body entered judgment for Mex-Tex. As made manifest by its ensuing findings of fact and conclusions of law, the trial court determined that Republic had indeed breached its contract, violated its duty to act in good faith and deal fairly, attempted to fully settle a claim through a partial payment, and failed to comply with statutory time limits in settling the claim.[1]

Republic attempts to overturn or modify the judgment entered against it via eight issues. Through them, it contends that the evidence was insufficient to support the findings of breached contract, of breached duty of good faith, of an improper attempt to enforce a full and final release by making only a partial payment, and of violating art.21.55 of the Texas Insurance Code. Also attacked are the methods by which the trial court calculated 1) the 18% statutory penalty per art. 21.55 of the Insurance Code and 2) prejudgment interest. We review the issues in their logical order and, upon doing so, affirm the judgment.

### Background

The circumstances that gave rise to the suit began with a leaking roof atop a mall housing various businesses and retail establishments. It had previously leaked but had undergone repair. Furthermore, Mex-Tex was contemplating its replacement when a hail

---

[1]Though damages were awarded, it does not appear that the sum included an amount to recompense the corporation for its purported mental anguish. However, Mex-Tex does not complain about that on appeal.

2

storm passed through the area on May 25, 1999. This storm further damaged the roof. Oral notice of the claim was forwarded to Republic within a day or so of the occurrence. Thereafter, a question arose as to whether the storm itself caused the damage or whether it pre-existed the squall. Nonetheless, both parties eventually agreed that the roof would be replaced and that the insurance company would pay for it. Yet, that did not end the controversy.

By the time the two parties agreed that the roof should be replaced, Mex-Tex had already replaced it. It believed it needed to be expedient to avoid delay and further injury to its tenants which could arise from other rains; evidence indicated that the Summer of 1999 was quite wet for West Texas. Furthermore, the cost exceeded $200,000. Yet, upon deducting the cost of insulation included in the total expense, Mex-Tex only submitted a claim for $179,000 to Republic. The latter refused to pay that sum because it concluded that it could replace the roof with one of identical make (but new of course) for approximately $145,000.[2] And, therein fomented the dispute presented to the trial court and to us. The trial court concluded that the $179,000 claim fell within the terms of the policy. We are asked to determine if it was right.

Pertinent to the resolution of the dispute are the following provisions of the insurance contract. The first states:

E.    LOSS CONDITIONS

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

_____

[2]Evidence indicates that the difference in cost was attributable to the speed with which the roof was installed (the contractor apparently made it a priority item and charged for doing so) and the cost of an insulation separator.

\*     \*     \*

3.      Duties in the Event of Loss or Damage

     a.      You must see that the following are done in the event of loss or damage to Covered Property:

         \*     \*     \*

         4.      Take all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss. If feasible, set the damaged property aside and in the best possible order for examination. Also keep a record of your expenses for emergency and temporary repairs, for consideration in the settlement of the claim. This will not increase the Limit of Insurance.

         \*     \*     \*

4.      Loss Payment

     a.      In the event of loss or damage covered by this Coverage Form, at our option, we will either:

         1.      Pay the value of lost or damaged property;
         2.      Pay the cost of repairing or replacing the lost or damaged property;
         3.      Take all or any part of the property at an agreed or appraised value; or
         4.      Repair, rebuild or replace the property with other property of like kind and quality.

     b.      We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

     c.      We will not pay you more than your financial interest in the Covered Property.

         \*     \*     \*

     f.      We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss if:

         1.      You have complied with all of the terms of this Coverage Part; and,

4

2.    (a) We have reached agreement with you on the amount of loss; or

       (b) An appraisal award has been made.

The second states:

G.    OPTIONAL COVERAGES

If shown in the Declarations, the following Optional Coverages apply separately to each item.

\*   \*   \*

3.    Replacement Cost

a.    Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation of this Coverage Form.

\*   \*   \*

c.    You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis.  In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damages.

d.    We will not pay on a replacement cost basis for any loss or damage:

    1.    Until the lost or damaged property is actually repaired or replaced; and,

    2.    Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

e.    We will not pay more for loss or damage on a replacement cost basis than the least of:

    1.    The Limit of Insurance applicable to the lost or damaged property;

5

2. The cost to replace, on the same premises, the lost or damaged property with other property:

    a. Of comparable material and quality; and

    b. Used for the same purpose; or

3. The amount you actually spend that is necessary to repair or replace the lost or damaged property.

### Issue One — Breach of Contract and the Sufficiency of the Evidence

In its first issue, Republic contends that the trial court erred by finding that it had breached its insurance contract. The company, in effect, is merely attacking the sufficiency of the evidence underlying the trial court's determination. Moreover, it apparently believes the evidence to be insufficient because it agreed to pay the "amount necessary for the replacement of the . . . roof with an identical roof" instead of the "more expensive roof installed by Mex-Tex . . . ." We overrule the issue.

*Standard of Review*

The standard of review applicable to the issue before us is well-settled and need not be repeated. Instead, we refer the parties to *Lewelling v. Lewelling*, 796 S.W.2d 164 (Tex.1990) (involving no-evidence claims).

*Application of Standard*

In construing an insurance policy, we must remember several rules. The first obligates us to strictly interpret the agreement in a manner favoring the insured if its terms are susceptible to more than one reasonable construction. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984). Next, we must afford the words written in it their plain

meaning when they contain no ambiguity.[3] *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984). So too must we enforce the contract as written, unless it is ambiguous. *State Farm Fire & Cas. Co. v. Reed*, 873 S.W.2d 698, 699 (Tex. 1993). With this said, we now turn to the policy to resolve the dispute before us.

As previously stated, two provisions of the policy dictate the extent of Republic's liability. Republic acknowledges this in its brief. Furthermore, those two provisions are found under the headings "Loss Conditions . . . Loss Payment" and "Optional Coverage . . . Replacement Cost." The former grants the *insurer* four options to satisfy its obligation. They include the right to 1) pay the value of lost or damaged property, 2) pay the cost of repairing or replacing the lost or damaged property, 3) take all or any part of the property at an agreed or appraised value, or 4) repair, rebuild or replace the property with other property of like kind and quality. However, if the insured acquired optional coverage then additional payment options are available. And, among these choices is that of the insured to "make a claim for loss or damage covered . . . on an actual cash value basis instead of on a replacement cost basis." Here, it is clear that the insured, Mex-Tex, pursued replacement, as opposed to the payment of the actual cash value of the property. Similarly clear is that while Republic may have initially vacillated on what it cared to do, it nonetheless agreed to pay for the replacement of the roof. Given these circumstances, we conclude that two of the various provisions mentioned above came into play and control the outcome.

---

[3]No one contends that any part of the insurance contract at bar is ambiguous. Nor do we find it so.

7

The first provision is found under "E. Loss Conditions," paragraph 4(a)(4), while the second appears at "G. Optional Coverages," paragraph 3(e)(2)(a). Via the former, Republic agreed to replace the property "with other property of like kind and quality." Through the second, it bound itself to pay the cost to replace the damaged property with property "[o]f comparable material and quality." Yet, what is meant by "like kind and quality" or "comparable material and quality" goes undefined in the policy. Nevertheless, and as previously noted, a rule of construction obligates us to assign each word and phrase in the policy their plain meaning. *Puckett v. U.S. Fire Ins. Co., supra*. To facilitate this endeavor, we turn to the dictionary for assistance.

According to *Webster's*, the word "like" can mean "same or nearly the same," "equal or nearly equal," or "something similar."[4] *Webster's Third International Dictionary* (1993). We are also informed that it is "a general word indicating resemblance or similarity ranging from virtual identity in all characteristics to a chance resemblance in only one." *Id.* Additionally, several of its many synonyms include "similar," "analogous," "comparable," and "identical." So, as can be seen, these descriptions hardly denote specificity. Again, the plain meaning of "like" can range anywhere from identical to a mere resemblance, and that is indeed quite a spectrum. Nevertheless, Republic itself provides us reason to narrow that spectrum when the term is used in an insurance contract like that at bar. As the insurer argued in its brief, when replacing damaged or lost property, "in some cases an identical substitute cannot be found." "In such a case the insurance company cannot pay for an exact replacement but must find something substantially similar," says the insurer.

---

[4]In *Black's Law Dictionary*, it is defined as "equal in quantity, quality, or degree," "corresponding exactly," or "similar or substantially similar." *Black's Law Dictionary* (1999).

That makes sense. If an insurer were obligated to replace damaged property with identical property and the quantum of identical property were small or non-existent, then it may not be able to perform its commitment or could only do so at an unexpected economic hardship. To mitigate against this result, logic would dictate that we construe "like" to have parameters less restrictive than those inherent in the word "identical."

Moreover, the propriety of our conclusion is further supported by Republic's later use of the word "comparable" in §G(3)(e)(2)(a) of the policy. Again, there it describes the extent of the insurer's liability when damaged property is to be replaced. And, according to pertinent authority, that word "indicates a likeness on one point or a limited number of points which permit a limited or casual comparison or matching together." *Webster's Third International Dictionary*, *supra*. Other definitions of it include "capable of being compared," "having enough like characteristics or qualities to make a comparison appropriate," "permitting or inviting comparison often in one salient point," "suitable for matching, coordinating, contrasting," "equivalent," or "similar." *Id.* In other words, "comparable" establishes a greater range of likeness or similarity than that implicit in "identical." *See Southwest Bell Tel. Co. v. Ramsey*, 542 S.W.2d 466, 476 (Tex. Civ. App.–Tyler 1976, writ ref'd n.r.e.) (remarking that the term "comparable" established a "vague standard"). So, given that Republic opted to use "comparable" when specifying the extent of its monetary liability under §G(3)(e)(2)(a), we hold it appropriate to assess its performance under §G(3)(e)(2)(a) by the greater range of choice inherent in that word.[5] *See Great Texas Cty*

_____

[5]To the extent Republic incorporated a word into the policy which established a somewhat vague standard or range of liability, our duty is to interpret the word in a manner favoring the insured, *i.e.* Mex-Tex. *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984). Our construction of "like" and "comparable" does that.

*Mut. Ins. Co. v. Lewis*, 979 S.W.2d 72, 74 (Tex. App.–Austin 1998, no pet.) (involving auto insurance and stating that the "qualifying words 'of like kind and quality' permit but do not require an engine of similar age, use, condition or . . . value").

Next, Mex-Tex alleged that Republic breached its contractual obligation because the former replaced the damaged roof with a comparable one, and the latter refused to pay for it. To support its contention, evidence was offered illustrating that both the old and new roof were "EPDM" roofing systems and that though they were "basically the same," they differed in the manner by which they were affixed to the top of the building. For instance, both consisted of the installation of an inch of insulation, a 45-millimeter membrane, flashing, drainage crickets, and roof scuppers. However, while the membrane of the old roof was affixed by rock and the force of gravity kept it on the top of the building, the new roof was mechanically fastened to the building. Furthermore, installation of the new roof did not require removal of the old. Instead, the ballast or rock was removed and the new membrane was placed atop the existing. And, though the cost of the mechanically fastened system was "a little higher" than "your [rock] ballast system," according to the roofing contractor who testified, the labor incident to installing it "is less." This led the witness to opine that "[t]hey generally come out pretty close to the same" and "one roof to the other is comparable."

Next, the difference in price, according to the same witness, was attributable to the "time of getting it done" and the cost of the insulation separator.[6] However, the estimate tendered into evidence and describing the installation of the $179,000 roof does not

---

[6]Moreover, the actual roof contractor testified that the replacement roof was of "like, kind and quality" as the previous roof.

distinguish between the amount of money attributable to each. Nonetheless, the insurance policy imposed on Mex-Tex the duty to "[t]ake all reasonable steps to protect the Covered Property from further damage by a Covered Cause of Loss" and to undertake "the repairs or replacement . . . as soon as reasonably possible after the loss or damage" as a condition of being paid. These provisions, coupled with the fact that its tenants suffered damage from rain seeping through the defective roof and would continue to so suffer, provided Mex-Tex with both contractual and practical basis for acting while Republic debated what to do. And, upon Mex-Tex requesting payment for the "comparable" roof, Republic refused.

Thus, we have before us some evidence illustrating that the damaged property was replaced by property of "comparable material and quality," *i.e.* by similar property. So too do we find of record evidence that Republic failed to pay the cost of the replacement. In short, we have sufficient evidence before us to support the trial court's finding of a breached contract.

Nevertheless, Republic would have us hold otherwise because it purportedly agreed to pay for a roofing system "identical" to that replaced, *i.e.* one ballasted by rock not mechanically fastened to the building. Admittedly, this evidence would be of import if Republic's liability were controlled by the word "identical." Yet, as we have previously discussed, it is not. Again, the insurer defined the scope of its liability through the use of words providing greater leeway or choice in the type of property which could be used to replace that which was damaged. Thus, its duty was not to simply pay for an *identical* roof. Rather, it committed, pursuant to §§E(4)(a)(4) and G(3)(e)(2)(a), to pay for a *comparable* one. While an identical roof may fall within the scope of a comparable roof, the scope of

11

comparable is not dictated by the meaning of identical. *Southwest Bell Tel. Co. v. Ramsey*, 542 S.W.2d at 476 (involving evidence of comparable sales). And, since there exists some evidence illustrating that while the roof installed by Mex-Tex may not have been the same or identical to that replaced, it was nonetheless comparable. So, Republic was duty bound to pay for it.

In sum, if an insurer cares to limit its exposure it can write a contract that expressly does so. Here, that could have easily been done by modifying the phrases "like kind and quality" and "comparable material and quality." Instead of using them as written, it could have stated that if available, identical property had to be used to replace the damaged item, otherwise comparable property could be used. Or, some similar, though not identical, phraseology could have been adopted. But, it did not, and it was not. Words of a less definitive nature twice were used, and those words make it possible to both restrict or broaden its liability depending upon the circumstances of the case. And, having included them in the contract, it is bound by them. Again, the Texas Supreme Court requires us to enforce the contract as written. *State Farm Fire & Cas. Co. v. Reed*, *supra*. Again, it obligates us to give those words their "plain, grammatical meaning unless doing so would clearly defeat the intentions of the parties." *Anadarko Petroleum Co. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). And, we do not believe that our construction of the policy at bar "clearly defeat[s] the intentions of the parties" when Republic itself explains, in its brief, why leeway is needed. As previously said, one should say what they mean and mean what they say.

### Issues Two and Three - Extra Expense and Mitigation Cost

In its second and third issues, Republic contends that the difference in cost between the price of an identical roof and the one actually installed could not be justified as an extra expense or an expense related to the cost of mitigating damage. Given our disposition of issue one, we need not address these issues.

In short, Republic was obligated to pay for a roof of comparable material and quality. The trial court found that the roof Mex-Tex installed fell within that scope. Therefore, Republic was duty bound to pay for it. So, whether the cost difference was justifiable as an extra expense or an expense incident to mitigation (when the policy itself obligated Mex-Tex to mitigate damage and act as quickly as reasonably possible) matters not, and we overrule Republic's second and third issues.

### Issue Six – Violation of Art. 21.55 of the Insurance Code

Next, Republic argues the trial court erred when it found that art. 21.55 of the Texas Insurance Code was violated. This is allegedly so because it complied with the time periods mandated by the statute, and Mex-Tex's claim was invalid, *i.e.* it did not seek payment for a comparable roof. Construing the issue to be an attack upon the sufficiency of the evidence underlying the finding, we overrule it.

*Standard of Review*

The applicable standard of review was discussed under issue one. We refer the parties to it.

*Application of Standard*

Article 21.55 of the Insurance Code establishes deadlines by which an insurer must act to avoid the imposition of statutory penalties. For instance, an insurer is obligated

13

thereunder to notify the insured of its decision to accept or reject a claim no later than 15 business days after receiving "all items, statements, and forms required by the insurer." TEX. INS. CODE ANN. art. 21.55 §3(a) (Vernon Supp. 2003). If the insurer then decides that the claim will be paid, it must do so within five business days. *Id.* at art. 21.55, §4. Similarly, §3(f) of the article also establishes a pertinent time period. It states that "if an insurer delays payment of a claim following its receipt of all items, statements, and forms reasonably requested and required . . . for more than 60 days, the insurer shall pay damages and other items as provided for in Section 6 of this article." TEX. INS. CODE ANN. art. 21.55, §3(f). With this said, we turn to the arguments proffered by Republic.

As to the contention that art. 21.55 was inapplicable because Mex-Tex lacked a valid claim, we refer the parties to our discussion and conclusion under issue one. There exists evidence of record supporting the trial court's decision that it had a valid claim which went unpaid. Thus, Republic is mistaken in suggesting that art. 21.55 is inapplicable for the reason stated.

Next, to the extent Republic argues that it complied with each provision, we again note that it failed to pay the claim of $179,000. Since it did not, it breached the terms of the insurance policy. Having done that, it also violated §3(f) of art. 21.55. *Cater v. United Serv. Auto. Ass'n*, 27 S.W.3d 81, 84 (Tex. App.–San Antonio 2000, pet. denied)*, quoting Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456 (5ᵗʰ Cir. 1997); *Oram v. State Farm Lloyds*, 977 S.W.2d 163, 167 (Tex. App.–Austin 1998, no pet.).[7]

---

[7]More importantly, whether the insurer acted in good or bad faith matters not. *Cater v. United Serv. Auto. Ass'n*, 27 S.W.3d 81, 84 (Tex. App.–San Antonio 2000, pet. denied).

Simply put, Mex-Tex averred that Republic "delayed payment of [its] claim . . . in violation of Article 21.55 . . . ." Since Republic did not ever pay the claim, there appears of record some evidence that supports the finding of liability under art. 21.55. Thus, we cannot say that the trial court erred in so adjudging.

### Issues Four and Five – Good Faith and Full Settlement via Partial Payment

In issues four and five, Republic argues that the trial court erred in finding that it acted in bad faith and in improperly attempting to enforce a full release of a claim by making only a partial payment. The import of these findings is questionable. Though the trial court found that Republic acted in bad faith and attempted to so obtain a full release of the claim, it did not expressly find that those acts caused Mex-Tex any damage. Nor did it use them as basis for awarding any damages or any other recovery against Republic.[8] Moreover, the latter has not explained how it was harmed by the findings or how our consideration of issues four and five will in any way affect its liability to Mex-Tex, given the absence of any concomitant findings of damage.

We recognize our obligation to address each issue raised and necessary to a final disposition of the appeal. TEX. R. APP. P. 47.1; *Texas Disposal Sys., Inc. v. Perez*, 80 S.W.3d 593, 594 (Tex. 2002). Yet, having rejected Republic's attack upon issues one and six (which involved the only choses-in-action upon which the judgment is founded), we do not see how either sustaining or overruling issues four and five would alter the trial court's judgment or affect the finality of ours. Consequently, they are not necessary to the final disposition of the appeal, and we will not consider them.

---

[8]The damages at bar were awarded solely for breached contract and violation of art. 21.55 of the Insurance Code.

15

### *Issue Seven – Calculation of Penalty*

Next, Republic argues that the trial court erred in awarding Mex-Tex $35,223.51 as a penalty for violating art. 21.55. This is supposedly error because its calculation failed to consider Republic's tender of the cost for replacing the roof with an identical one, *i.e.* $145,000, in August of 1999. Thus, the penalty should be calculated only upon the difference between the amount tendered and the amount awarded by the trial court for breach of contract, according to the insurer. We overrule the issue for several reasons.

First, Republic cites no authority in support of its contentions. Same was required by Texas Rule of Appellate Procedure 38.1(h). Having failed to abide by that rule, it waived the contention. *In re Williams,* 998 S.W.2d 724, 730 (Tex. App.–Amarillo 1999, no pet.).

Second, §6 of art. 21.55 states that "[i]n all cases where a claim is made pursuant to a policy . . . and the insurer liable therefor is not in compliance with the requirements of this article, such insurer shall be liable to pay the holder of the policy . . . 18 percent of the amount of *such claim*, together with reasonable attorney's fees." TEX. INS. CODE ANN. art. 21.55, §6 (emphasis added). As can be seen, in specifying the amount upon which the 18% penalty is to be calculated, the legislature expressly referred the amount of the "claim." Here, the "claim" submitted by Mex-Tex was for $179,000, not the difference between $179,000 and $145,000. Thus, to use some number other than the actual amount of the "claim" in calculating the penalty would be to ignore the words of the statute; that we cannot do. *Spradlin v. Jim Walter Homes, Inc.,* 34 S.W.3d 578, 580 (Tex. 2000).

Third, and assuming *arguendo* that the effect a tender of payment has upon the accrual of interest is the same as that on the accrual of a penalty (which we believe Republic to be suggesting), the amount tendered must be that actually owed. *Bray v. Cadle Co.*, 880 S.W.2d 813, 818 (Tex. App.–Houston [14th Dist.] 1994, writ denied). Since the tender of a lesser amount does not toll the accrual of interest, *Hoxie Implement Co. v. Baker*, 65 S.W.3d 140, 156 (Tex. App.–Amarillo 2001, pet. denied), logic dictates that it has the same effect (or lack thereof) on the accrual of a penalty. Consequently, Republic was obligated to tender the entire $179,000 sum, and because it did not, the offer to simply pay $145,000 did not prevent the penalty from accruing on the entire amount owed.

### *Issue Eight – Prejudgment Interest*

In its final point of error, Republic contends that the trial court erred in awarding Mex-Tex the amount of prejudgment interest it awarded. We overrule the issue for the following reasons.

First, it argues that the sum upon which the interest should have been calculated was the difference between the amount it tendered in August of 1999 ($145,000) and the amount of the claim ($179,000). However, as discussed under issue seven, tender of less than the amount owed does not stop interest from accruing. *Hoxie Implement Co. v. Baker*, *supra*. Since Republic tendered less than the entire $179,000, the prejudgment interest did not stop accruing on the entire sum due.

Next, the contention that §304.105 of the Texas Finance Code effectively stopped the accrual of interest during the period in which Mex-Tex had to accept the $145,000 is misplaced. Republic concedes that it never asserted this before the trial court. Having

17

failed in that respect, it also failed to preserve it for review. *Haley v. GPM Gas, Corp.,* 80 S.W.3d 114, 119-20 (Tex. App.–Amarillo 2002, no pet.); TEX. R. APP. P. 33.1(a)(1). Yet, even if it had been preserved, we see that §304.105 applies only to suits for wrongful death, personal injury, and property damage. TEX. FIN. CODE ANN. §304.101 (Vernon Supp. 2003). A suit against an insurer for breaching its contract with its insured (like that at bar) does not fall within any of those categories. *Head Indus. Coatings & Serv., Inc. v. Maryland Insurance Co.*, 981 S.W.2d 305, 311 (Tex. App.–Texarkana 1998, pet. denied). Thus, the provision has no application at bar.

We affirm the judgment of the trial court.


Brian Quinn
Justice

18