# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 31, 2011

No. 10-40967

Lyle W. Cayce
Clerk

PEC MINERALS LP,

Plaintiff-Appellant

v.

CHEVRON U.S.A., Inc.,

Defendant-Appellee

Appeal from the United States District Court
for the Eastern District of Texas
No. 6:09-CV-166

Before DAVIS, PRADO, and OWEN, Circuit Judges.

PER CURIAM:[*]

This case involves the interpretation of a 1944 oil and gas lease (the "Lease"). Plaintiff-Appellant PEC Minerals LP ("PEC"), successor in interest to the original lessor, filed suit seeking to force Defendant-Appellee Chevron U.S.A. Inc. ("Chevron"), successor in interest to the original lessee, to release all its rights under the Lease to certain disputed acreage. PEC argued to the district court that a provision of the Lease amended the Lease's "habendum" clause such that continued production of oil or gas on a particular unit of land continued the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-40967

lease in force only as to that unit rather than to the entire acreage covered by the Lease. The district court held that the provision of the Lease relied upon by PEC did not amend the Lease's habendum clause, and thus the district court granted Chevron's motion for summary judgment. PEC now appeals. For the following reasons, we AFFIRM the district court's ruling on summary judgment.

I.

In 1944, Louis Werner Saw Mill Company (the "Lessor") entered into the Lease with Skelly Oil Company (the "Lessee"), which covered 29,105.70 acres in Panola County, Texas. Through subsequent transactions, PEC later became the successor in interest to the Lessor and Chevron became the successor in interest to the Lessee. The dispute in this case revolves around the interpretation of two provisions in the Lease.

Paragraph 2 of the Lease states: "Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called "Primary term") and as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder." This is called the Lease's habendum clause.

Paragraph 5(f) of the Lease provides for dividing the Lease into separate units of land and states the following:

> But anything in this lease to the contrary notwithstanding, it is agreed that as additional consideration for the payment by Lessee of the said cash payment of $50,000.00 and its agreement to pay the said fixed rentals as and when due under the above provisions hereof, Lessee shall have the right, in event it shall, prior to March 10th, 1948, drill a well on said leased premises or on acreage pooled therewith productive of oil, gas or other minerals in paying quantities, to continue this lease in force as to each of the other undeveloped drilling or spacing units "all to be selected by Lessee as soon as practicable after the completion of such well" for as long as such paying production shall continue and without being obligated to conduct drilling operations on such undeveloped units, by paying or tendering to Lessor, or to its credit in said depository bank,

2

No. 10-40967

commencing on or before March 10th, 1948, and annually thereafter until the end of the said primary term of this lease, a rental of one dollar per acre for each acre contained in each such undeveloped drilling or spacing unit or fraction thereof. But the commencement by Lessee of drilling operations on any such undeveloped drilling or spacing unit shall relieve Lessee from the payment of such rental thereon, <u>and if paying production should result from such operations this lease shall continue in force as to the drilling or spacing unit on which such production is had for as long as such production continues</u>. It is agreed that the provisions of this subparagraph (f) hereof shall be separable and shall be considered and applied as a separate agreement as respects each such undeveloped drilling or spacing unit.

(underline added). The meaning of the underlined language above is the central dispute between the parties.

The original primary term of the lease was for ten years. Through a series of amendments, the parties extended the primary term of the Lease to 1969. When the parties executed the final extension of the primary term in 1964 (the "1964 Agreement"), Chevron agreed to release any units of land not producing when the primary term expired:

[O]n March 10, 1969, Lessee will re-lease back to the Lessor the acreage in said lease not then producing or embraced in a producing unit or embraced in a drilling unit upon which operations for drilling have commenced, provided that if such operations on such drilling unit do not result in paying production, the acreage included in such drilling unit shall be released to Lessor upon the completion of such drilling operations by Lessee.

The 1964 Agreement also stipulated that the original terms and provisions of the Lease shall otherwise remain in full force and effect.

On the date the primary term expired, Chevron did in fact release the units of land not producing oil or gas pursuant to the 1964 Agreement. Chevron retained 80 productive units, designated in an exhibit to its 1969 release. Of the original 80, six of the units are in dispute in this case.

3

No. 10-40967

As of October 2008, at least five of the six disputed units were not producing oil or gas.[1]  Around that time, PEC entered into a lease with a third party, XTO Energy, Inc. ("XTO"), to lease the disputed units.  When XTO claimed a title defect on the basis of the Lease with Chevron, PEC requested that Chevron execute a full release of the disputed units.  Chevron refused, and the present action ensued.

PEC filed suit in state court to establish clear title to 2,397.17 acres contained in the disputed units.  Chevron removed the case to the federal district court.  The parties filed cross motions for summary judgment.  The parties both agreed that the Lease was unambiguous (although the parties asserted contradictory interpretations of the contractual language at issue).  The district court, therefore, interpreted the Lease as a matter of law.

The district court held that the language of Paragraph 5(f) was not clear, precise, and unequivocal.  The district court concluded that under the habendum clause, production outside the disputed units held the Lease on the entire leased acreage, including the acreage in the disputed units.  The district court held that Paragraph 5(f) concerned "delay rentals" and related matters that applied only during the Lease's primary term and did not address the required action to maintain the Lease during the secondary term, which was controlled by the habendum clause.  PEC now appeals the district court's ruling.

## II.

This court reviews a district court's order for summary judgment rendered on cross motions *de novo*.  *Cedyco Corp. v. Petro Quest Engergy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007).  Each motion with its supporting evidence is independently reviewed.  *Morgan v. Plano Ind. School Dist.*, 589 F.3d 740, 745

---

[1]  The district court found that one of the six disputed units was producing at that time, but PEC has asserted that a fact issue exists as to whether the sixth unit was producing enough to satisfy the production requirements of the Lease.

4

No. 10-40967

(5th Cir. 2009). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2011). Interpretation of an unambiguous contract is a legal issue that may be decided on summary judgment. *Boudreaux v. Unionmutual Stock Life Ins. Co.*, of Am., 835 F.2d 121, 123 (5th Cir. 1988).

III.

PEC argues that Paragraph 5(f) modifies the Lease's habendum clause in Paragraph 2 such that acreage is held by the Lease past the primary term only with regard to the property in the particular units of land where production continues. For the following reasons, we agree with the district court that Paragraph 5(f) does not modify the habendum clause.

A.

1.

The habendum clause in an oil and gas lease generally establishes the duration of the lease. *See* Owen L. Anderson, et al., HEMINGWAY OIL AND GAS LAW AND TAXATION, § 6.4, 247 (4th ed. 2004). A traditional habendum clause provides that the lease will extend to all acreage covered by the lease as long as oil and gas is produced anywhere on the leased property. *Id.*; *see also Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 149 (Tex. 2004).

Parties to a lease may modify a traditional habendum clause either in that clause or through another provision of the lease. Anderson, HEMINGWAY OIL AND GAS LAW AND TAXATION at § 7.13(D), 395-97. A clause dividing a lease into units may modify the habendum clause, depending on its specific provisions. *Id.* However, a clause dividing a lease into units "must be read carefully" to determine whether it relates to perpetuation of the lease beyond the primary term or to other aspects of the Lease, such as delay rentals. *Id.* at 395-96.

No. 10-40967

Moreover, the general rule is that "[a]bsent contrary language, the habendum clause of an oil and gas lease is indivisible." *Id*. at 395. Texas law goes further and holds that another provision of a lease may modify the habendum clause only if the language used is "so clear, precise, and unequivocal that [it] can reasonably [be given] no other meaning." *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). This Texas rule of interpretation is important to the resolution of this appeal.

2.

Paragraph 2 of the Lease is a traditional habendum clause. It states that "[s]ubject to other provisions herein contained, this lease shall be for a term of ten years from this date (called "Primary term") and as long thereafter as oil, gas, or other mineral is produced from said land or land with which said land is pooled hereunder." Under Texas law, an habendum clause referring to "said land" extends the lease as to all the leased property while production of oil or gas occurs anywhere on the property. *Ridge*, 148 S.W.3d at 149. Thus, "in the absence of anything in the lease to indicate a contrary intent, production on one tract will operate to perpetuate the lease as to all tracts described therein and covered thereby." *Matthews v. Sun Oil Co.*, 425 S.W.2d 330, 333 (Tex. 1968).

PEC argues that Paragraph 5(f) modifies Paragraph 2 so that production of oil or gas on a unit of land holds the Lease only as to that unit during the secondary term. However, for the reasons explained below, we conclude that the language of Paragraph 5(f) relied upon by PEC does not clearly, precisely, and unequivocally divide or limit the effect of the habendum clause on a unit-by-unit basis. Therefore, Paragraph 5(f) does not meet the high standard Texas law requires for modification of the habendum clause. *See Anadarko*, 94 S.W.3d at 554.

No. 10-40967

B.

1.

First, as the district court held and as Chevron emphasizes on appeal, it is clear that Paragraph 5(f) relates to "delay rentals" and the Lease's application during the primary term. In a traditional oil and gas lease, during the primary term of the lease, the lessee agrees to drill a well or if it does not drill, pay a sum of money called a "delay rental." This payment allows the lessee to delay drilling operations and still maintain the lease. *See* Anderson, HEMINGWAY OIL AND GAS LAW AND TAXATION, at § 6.2, 218. Under a typical delay rental provision, therefore, drilling relieves the lessee of the obligation to pay the delay rentals. *Id*.

Paragraph 5(f) is a delay rental provision. It establishes an annual delay rental of $1 per acre of undeveloped land "until the end of the said primary term." The first half of the next sentence—the sentence relied upon by PEC—goes on to explain, in typical fashion, "[b]ut the commencement by Lessee of drilling operations on any such undeveloped drilling or spacing unit shall relieve Lessee from the payment of such rental [of $1 per acre] thereon . . . ."

It is only the second half of this sentence that arguably supports PEC's position. It states "and if paying production should result from such operations this lease shall continue in force as to the drilling or spacing unit on which such production is had for as long as such production continues." PEC argues that this half sentence extends the Lease only with regard to those units of land on which production continues, even though the Lease is well beyond the primary term.

We conclude, however, that because the language relied on by PEC is inextricably embedded in the Lease's delay rental provision, this language only applies during the primary term of the Lease. It does not clearly, precisely, and unequivocally amend the Lease's habendum clause, as required by Texas law.

7

No. 10-40967

*Anadarko*, 94 S.W.3d at 554.  The district court was correct that this sentence should be read as simply "clarify[ing] the circumstances under which delay rentals are no longer necessary during the primary term" of the Lease.  The sentence clarifies that delay rentals are not due for any unit during drilling and continued production on that unit.  Without additional clear, precise, and unequivocal language to the contrary, we agree that the partial sentence in Paragraph 5(f) has no effect beyond the primary term of the Lease, which is when the delay rental provisions of the Lease were relevant.

2.

This court's opinion in *Glasscock v. Sinclair Prairie Oil Co.*, 185 F.2d 910, 912 (5th Cir. 1950), which involved similar language embedded in a Texas oil and gas lease's delay-rentals clause, supports our conclusion.  The lease in that case included an habendum clause indistinguishable from the clause in the present case.  The lessor relied on language in the delay-rentals clause that provided in part: "Operations for the drilling of a well or reworking operations on any well on said land or production from any well thereon shall continue this lease in force only in so far as this lease covers a tract for each well with respect to which operations for drilling are being conducted, or on which reworking operations are being conducted, or from which production is being obtained." *Glasscock*, 185 F.2d at 192.  The court held that this provision applied only to the primary term of the Lease and that its purpose was "to assure to the lessor during that period a continuance of the rental payments . . . in the event of production or drilling under the lease . . . ." *Id.*

Although the language at issue in *Glasscock* is not identical to Paragraph 5(f) of the instant lease, it is instructive.  PEC argues that *Glasscock* is not helpful because the *Glasscock* provision did not include the words "for as long as such production continues," as in Paragraph 5(f).  Nevertheless, despite this difference, *Glasscock* stands for the proposition that a delay rental provision that

No. 10-40967

allows production to only hold the lease on acreage in specific units is intended to avoid a forfeiture by the lessor of all the delay rentals on other units upon production of a single well.  Because delay rentals are only relevant during the primary term of the Lease, under the reasoning of *Glasscock* a provision such as Paragraph 5(f) that is embedded in a delay-rentals clause should not be read as affecting the duration of the Lease beyond the primary term.

3.

PEC argues that Paragraph 5(f) is similar to lease provisions that Texas courts have interpreted as modifying habendum clauses.  In these cases, the courts have held that the lessee may retain acreage only in units where production continues during the secondary term.  However, in contrast with Paragraph 5(f) of the instant Lease, each case PEC cites in support of this argument involves a lease containing clear language modifying the habendum clause and limiting the duration of the lease with regard to each unit based on continued production in that unit during the secondary term.

For instance, in *SMK Energy Corp. v. Westchester Gas. Co.*, 705 S.W.2d 174 (Tex. App. – Texarkana 1985), the habendum clause was amended by a provision that clearly and expressly stated "this lease shall not (repeat shall not) extend beyond the primary term as to any part of the acreage described therein, excepting that part of the acreage which is then (at the end of the primary term) pooled or united for drilling, reworking operations, or production of oil and/or gas from such unit or units . . . ."  *Id.* at 176.  Similarly, in *Riley v. Meriwether*, 780 S.W.2d 919, 923 (Tex. App. - El Paso 1989), the habendum clause itself expressly stated that the lease was to continue "for so long thereafter, as to each of the respective tracts . . . ." oil and gas are produced.

PEC also cites *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 504 (Tex. App. - Waco 1997) for the proposition that a provision modifying the habendum clause need not refer to the habendum clause by name.  But in that

case, the lease's royalty clause plainly stated that the lease would terminate if the lessee failed to pay royalties. *Id.*

Unlike the provisions at issue in these other cases, the language in Paragraph 5(f) does not clearly alter the habendum clause based on unit production or address the duration of the Lease with regard to non-producing units after the primary term expires. For example, in contrast with the lease in *SMK*, the sentence in Paragraph 5(f) on which PEC primarily relies fails to state that the Lease "shall not" extend beyond the primary term to non-producing acreage.

In addition, PEC puts too much emphasis on the language in the habendum clause providing that the clause is "[s]ubject to other provisions herein contained . . . ." in comparison with the language in Paragraph 5(f) stating "[b]ut anything in this lease to the contrary . . . ." This language does not establish with clarity that Paragraph 5(f) was intended to supersede the habendum clause with regard to the requirements for retaining acreage during the secondary term of the Lease. Similarly, the last sentence of Paragraph 5(f) stating that the provisions of that paragraph "shall be separable and shall be considered and applied as separate agreement as respects each such undeveloped drilling or spacing unit" does not clearly affect the habendum clause, as PEC argues. This language separates Paragraph 5(f)'s delay-rental provisions by unit but does not expressly separate any other provisions of the Lease. *See Matthews v. Sun Oil Co.*, 425 S.W.2d 330, 333 (Tex. 1968)(stating that simply "[b]ecause a lease will be considered as two leases for certain purposes, it does not follow that a single lease will be considered as two leases for all purposes").

The lack of clarity in Paragraph 5(f) in comparison to the leases in the Texas cases PEC cites provides further support for our conclusion that

No. 10-40967

Paragraph 5(f) relates to delay rentals only, as in *Glasscock*, and should be not be interpreted to modify the Lease's habendum clause.

## C.

In response to questions from the court, PEC's counsel asserted at oral argument that the 1964 Agreement by which the parties extended the primary term of the Lease until 1969 tends to show that the parties did not intend the original Lease to allow one producing well to hold the entire Lease during the secondary term. This argument has no merit.

In the 1964 Agreement, the Lessee agreed to release back to the Lessor any non-producing units at the end of the extended primary term. This is the only written provision between the parties indisputably requiring the Lessee to release its rights to non-producing units back to the Lessor at a particular time. This provision supports rather than detracts from the conclusion that the Lessee was not, prior to the 1964 Agreement, operating under a contractual obligation to release non-producing units at the end of the primary term. If Paragraph 5(f) already required the Lessee to release non-producing units upon expiration of the primary term, this provision of the 1964 Agreement would have been superfluous. Accordingly, to the extent the 1964 Agreement has any bearing on our interpretation of the Lease, it supports Chevron's interpretation. The 1964 Agreement does not alter our interpretation of the Lease's original terms and provisions, which apply to the units retained by Chevron.[2]

## D.

Finally, we address the incongruence noted by the parties during oral argument between the obligations the Lease placed on the Lessee to maintain

_____

[2] The 1964 Agreement expressly states that the original terms and provisions of the Lease shall otherwise remain in full force and effect. We further note that the parties entered into the 1964 Agreement 14 years after we decided the *Glasscock* case and, therefore, at the time the parties were presumably aware of our interpretation of the similar lease in that case.

the Lease during the primary term compared to those relating to the secondary term. In response to questions from the court, PEC's counsel pointed out that (1) the Lease required either production or the payment of delay rentals for each and every individual unit to maintain the entire Lease during the primary term; but (2) according to Chevron's interpretation, the Lease requires nothing more than production on a single unit to maintain the entire Lease during the secondary term. We do not agree with PEC, however, that this inconsistency requires the conclusion that the parties could not have intended production on a single unit to maintain the entire Lease during the secondary term.

As explained above, a delay-rentals clause is generally designed to provide a lessor with income in the event a lessee fails to drill on a particular unit. This delay-rental income substitutes for the royalty income that a lessor would otherwise be entitled to if the lessee obtained paying production on a unit. *See generally* Anderson, HEMINGWAY OIL AND GAS LAW AND TAXATION, at § 6.2, 218. Thus, the obligation to make delay-rental payments provides an incentive to the lessee to begin drilling and producing, which generates royalties for the lessor. The delay-rental payment can be viewed as a penalty imposed on the lessee if it fails to drill and as income to the lessor that takes the place of the hoped-for royalties.

Therefore, the extension of this Lease during the secondary term to acreage outside of producing units is not remarkable. This is how traditional habendum clauses operate, as explained above. We also can assume that this reflected the parties' expectation that production developed during the primary term—which was encouraged by delay-rental payments— would continue to generate royalty income during the secondary term. Although the Lessor could have achieved an additional economic benefit by including unequivocal language terminating the Lease during the secondary term with regard to all non-

No. 10-40967

producing units, as in the other Texas cases cited by PEC, the Lessor failed to do so.

The economic bargain struck by the parties in this case is the same bargain struck by the parties in *Glasscock*. We decline to second-guess that bargain decades after the fact in the absence of clear, precise, and unequivocal language modifying the Lease's traditional habendum clause and expressly stating that more than production on a single unit is required to maintain the Lease during the secondary term.

## IV.

For the foregoing reasons, the district court's order granting Chevron's motion for summary judgment is AFFIRMED.

10-40967

OWEN, Circuit Judge, concurring.

I agree with the panel majority's conclusion that, under applicable Texas law, paragraph 5(f) of the 1944 oil and gas lease (Lease) at issue does not modify the Lease's general habendum clause. I also agree with much of the accompanying analysis. I write separately to emphasize the importance of reading the Lease as a whole in interpreting its provisions. With great respect, the panel majority focuses too narrowly on the placement of the disputed language in the Lease. It is not the location, but rather the meaning of the provision read in harmony with other portions of the Lease, which confirms that production anywhere on the leased property (or land pooled therewith) is sufficient to maintain the Lease during the secondary term under the facts before us.

## I

The Lease at issue was executed in 1944. It originally covered 29,105.70 acres of contiguous and non-contiguous land. The primary term of the Lease was initially ten years, and originally, the primary term was to expire in 1954. However, the parties extended the primary term several times, the last extension occurring in an amendment executed in 1964, extending the primary term until March 10, 1969.

Under Texas law, when construing an unambiguous oil and gas lease, our "primary duty is to ascertain the parties' intent as expressed within the lease's four corners" and, in turn, to "give the lease's language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions."[1] Moreover, "[w]e examine the entire lease and attempt to harmonize all its parts . . . because we presume that the parties to a lease intend every clause to

---

[1] *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) (citations omitted).

14

10-40967

have some effect."[2]  Significantly, a lease will not be held to "impose a special limitation on the grant [of a mineral estate] unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning."[3]

It is undisputed that paragraph 2 of the Lease contains a general habendum clause providing, upon the expiration of the primary term, for a secondary term of "as long thereafter as oil, gas or other mineral is produced from said land or land with which said land is pooled hereunder."  To further limit the secondary term, other portions of the Lease must do so via "clear, precise, and unequivocal" language.[4]  Paragraph 5(f), considered in conjunction with the rest of that paragraph as well as other paragraphs in the Lease, does not use such language.  As discussed by the panel majority,[5] we construed similar language in *Glasscock v. Sinclair Prairie Oil Co.* to "apply only to the primary term" in order to "assure to the lessor during that period a continuance of the rental payments with a reduction instead of a cessation thereof in the event of production or drilling under the lease."[6]  Significantly, the Supreme Court of Texas cited *Glasscock*'s holding with approval in *Skelly Oil Co. v. Archer*,[7] providing us with binding precedent on this issue of state law.[8]  The lease at hand, as a whole, like the paragraph at issue in *Glasscock*, "first

---

[2] *Id.* (citations omitted).

[3] *Id.* (citation omitted).

[4] *Id.* (citations omitted).

[5] *Ante*, at 8-9.

[6] 185 F.2d 910, 912 (5th Cir. 1950).

[7] 163 Tex. 336, 356 S.W.2d 774, 780 (1961).

[8] *Packard v. OCA, Inc.*, 624 F.3d 726, 729 (5th Cir. 2010) ("In determining questions of Texas law, this court looks to the decisions of the Texas Supreme Court, which are binding." (citation omitted)).

10-40967

provides for the payment of a fixed sum on or before a certain date upon pain of termination of the lease; it next provides for annual delay rentals . . . ; it then contains the above quoted paragraph, which provides for reduction of the rental by one dollar per acre upon each designated [unit] whereon a producing well is located."[9]

The panel majority construes *Glasscock* to hold that a provision "that is embedded in a delay-rentals clause should not be read as affecting the duration of the Lease beyond the primary term."[10]  I disagree.  *Glasscock* simply interpreted an unambiguous lease provision that, by its language, applied only to the primary term and did not "impose an additional limitation upon the determinable estate granted by the lease."[11]  Paragraph 5(f) of the Lease is properly read the same way based on Texas precedent that confirmed the propriety of *Glasscock*'s conclusions.

## II

PEC Minerals nevertheless contends that paragraph 5 must be read to sever each drilling or spacing unit from the Lease such that production on one unit will not maintain the lease as to other units.  It makes two arguments in support of this construction, one of which is foreclosed by the case law, as discussed above, and the other of which finds no support in the Lease.

Paragraph 5 generally deals with the Lessee's payment of fixed and delay rentals during the primary term as well as the Lessee's duty to develop the Lease.  Paragraph 5(a) provides that fixed payments were to be made at the end of each year for the first four years of the Lease.  The Lease provides in paragraph 5(g) that these fixed payments were to be made even if the Lessee

---

[9] 185 F.2d at 912.

[10] *Ante*, at 9.

[11] 185 F.2d at 912.

16

released or surrendered all or part of the lands covered by the Lease. With regard to delay rentals, this is an "unless" lease. If delay rentals are not paid, the lease terminates as to the acreage to which the delay rentals pertained.[12]

With regard to delay rentals, a number of scenarios are contemplated by paragraph 5, including, but not limited to, the possibilities that (1) the Lessee could defer *all* drilling during the primary term and maintain the Lease as to all acreage until the end of the primary term by paying the full amounts of delay rentals each year,[13] and (2) if production in paying quantities were obtained by a date specified in the Lease, delay rentals could be reduced proportionately. It is this latter possibility to which paragraph 5(f) is primarily addressed. It provides:

> But anything in this lease to the contrary notwithstanding, it is agreed that as additional consideration for the payment by Lessee of the said cash payment of $50,000.00 and its agreement to pay the said fixed rentals as and when due under the above provisions hereof, Lessee shall have the right, in the event it shall, prior to March 10th, 1948, drill a well on said leased premises or on acreage pooled therewith productive of oil, gas or other mineral in paying quantities, to continue this lease in force as to each of the other undeveloped drilling or spacing units "all to be selected by Lessees

---

[12] *See infra* note 13, quoting paragraph 5(b) of the Lease; *see also Holman v. Meridian Oil, Inc.*, 988 S.W.2d 802, 807 (Tex. App.—San Antonio 1999, pet. denied) ("It is well settled that under the terms of an 'unless' lease, the failure to begin a well or pay delay rentals, *ipso facto*, terminates the lessee's interest.").

[13] The Lease provides in paragraph 5(b):

> If operations for drilling are not commenced on said lands, or on acreage pooled therewith as above provided, on or before March 10th, 1948, this lease shall then terminate as to both parties unless on or before said last mentioned date Lessee shall pay . . . ($29,105.70), (hereinafter called "delay rental") which shall cover the privilege of deferring the commencement of drilling operations for a period of twelve (12) months from and after said last mentioned date. In like manner and upon like payments or tenders of such delay rental, annually, the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the remainder of said 10-year primary term.

as soon as practicable after the completion of such well" for as long as such paying production shall continue and without being obligated to conduct drilling operations on such undeveloped units, by paying or tendering to Lessor, . . . commencing on or before March 10th, 1948, and annually thereafter until the end of the said primary term of this lease, a rental of one dollar per acre for each acre contained in each such undeveloped drilling or spacing unit or fraction thereof.   But the commencement by Lessee of drilling operations on any such undeveloped drilling or spacing unit shall relieve Lessee from the payment of such rental thereon, and if paying production should result from such operations this lease shall continue in force as to the drilling or spacing unit on which such production is had for as long as such production continues.  It is agreed that the provisions of this sub-paragraph (f) hereof shall be separable and shall be considered and applied as a separate agreement as respects each such undeveloped or spacing unit.

Existing case law compels me to conclude that this provision does not have the effect of severing each drilling or spacing unit from the Lease and treating each as a separately leased property for all purposes such that production on one unit would fail to hold the Lease as to others, although I think that it would be a closer question if we were writing on a blank slate.  In light of precedent, paragraph 5 must be read as permitting the Lessee to reduce proportionately the amount of delay rental that is owed by drilling on unproductive units or obtaining production from previously unproductive units but not creating a separate lease for each unit.

PEC Minerals argues that the language in the last sentence of paragraph 5(f) would serve no purpose unless it means that each drilling or spacing unit is treated as separately leased.  That is not the case.  The last sentence of paragraph 5(f) can reasonably be construed as making clear that if the Lessee begins drilling on a unit in order to eliminate the obligation to pay delay rentals for the acreage covered by that unit, the entire Lease is not forfeited or terminated if a dry hole results.  In other words, this sentence could be reasonably construed to mean that if the Lessee fails to pay delay rentals

attributable to a particular unit while drilling, but a dry hole then results, any contention that the Lease expired due to the non-payment of delay rentals for some period of time would affect only that unit and not the entire Lease. A similar protective provision is found in the immediately preceding subparagraph of paragraph 5 regarding development of the Lease.[14] Essentially, subparagraph 5(e) requires the Lessee to designate a unit around a well once production is obtained and provides a safety net perpetuating the Lease as to each such producing unit in the event the Lease is terminated or lost as to other acreage for any reason.

PEC Minerals also argues that it is "unfair" and unreasonable to conclude that the parties contemplated that a single well could hold the entire leased acreage, which was originally 29,105.70 acres, after the primary term. This contention has a concrete answer under the terms of the Lease. As noted above, the Lessee is entitled under paragraph 5(b) to defer *all* drilling until virtually the last day of the primary term by paying delay rentals on all the leased acreage. If that had occurred, paragraph 6 of the Lease permits the Lease to be maintained in force and effect by drilling, and a single productive well would hold the entire acreage after the primary term:

---

[14] Paragraph 5(e) provides, in pertinent part:

After the discovery of oil, gas or other minerals in paying quantities on the above-described leased premises, or on acreage pooled therewith, Lessee shall reasonably develop the acreage retained and pooled hereunder, but in discharging this obligation it shall in no event be required to drill more than one well per 640 acres of the area retained and pooled hereunder and capable of producing oil, gas or other minerals in paying quantities. . . . It is agreed that in case of cancellation, termination, or forfeiture of this lease for any cause the discovery of such paying production shall hold and perpetuate this lease as to such a drilling or spacing unit around the well for as long as such production continues without any obligation on Lessee to conduct further drilling operations thereon, and that such unit should be selected by Lessee as promptly as practicable after such discovery of paying production.

10-40967

> If at any time subsequent to 60 days prior to the beginning of the last year of the primary term and prior to the discovery of oil, gas or other minerals on said lands or on acreage pooled therewith, Lessee should drill a dry hole thereon, no rental payment or operations are necessary in order to keep the lease in force during the remainder of the primary term.  If at the expiration of the primary term, oil, gas or other minerals are not being produced on said land [the leased property], or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon, or shall have completed a dry hole thereon within 60 days prior to the end of the primary term, the lease shall remain in force so long as operations are prosecuted with no cessation of more than 60 consecutive days, and if such operations result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral shall be produced on said lands or acreage pooled therewith.

Accordingly, although PEC Minerals' argument that the parties did not intend for one well to hold such a large leasehold has some equitable appeal, it is refuted by the terms of the Lease.

### III

The panel majority relies on the March 1, 1964 amendment to the Lease as supporting the Lessee's construction of paragraph 5(f) of the original Lease. I respectfully disagree.  The 1964 amendment does not clearly support either party's position regarding paragraph 5(f).

At two junctures, the 1964 amendment says that the Lease is extended on the same terms and conditions as the original lease.  However, in another provision of the 1964 amendment, the parties agreed that in consideration of recited nominal consideration and "all the mutual agreements and benefits" contained in the 1964 amendment, at the end of the extended primary term (March 1969), the Lessee would release acreage that was not "embraced in a producing unit" or drilling unit upon which operations have been commenced. The parties also agreed that the Lessee could release "any acreage under the lease on which it does not care to further explore, develop or produce" at any

10-40967

time during the extended primary term and have no obligation to pay delay rentals on the released acreage. The panel majority says that the agreement to release non-producing acreage at the end of the primary term would be surplusage if paragraph 5(f) already terminated the Lease as to non-producing acreage at the end of the primary term. But the provision regarding the Lessee's right to release acreage at any time during the primary term is unquestionably surplusage. The original Lease contained an express provision, in paragraph 5(d), permitting the Lessee to do precisely that.[15] I therefore cannot conclude that we must construe paragraph 5(f) of the original Lease as not requiring a release of non-producing acreage at the end of the primary term in order to avoid surplusage in the 1964 amendment since the 1964 amendment has other surplusage in it.

Nevertheless, I agree with the panel majority that under existing precedent, we cannot construe paragraph 5(f) of the original Lease as creating a separate lease for each production or drilling unit such that production on one unit will not hold the Lease as to all other units.

*       *       *

I concur in the judgment rendered by the panel majority but not all of the reasoning in its opinion.

---

[15] Paragraph 5(d) provides:

> Lessee may at any time exercise and deliver to Lessor . . . a release or releases covering any portion or portions of the above described lands, and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the delay rental payable hereunder shall be reduced to the proportion that the acreage covered by this lease is reduced by such release or releases.

*See also Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 152 (Tex. 2004) (recognizing that Texas law allows a lessee to surrender all or part of an oil and gas lease, either under an express provision of the lease or by mutual agreement of the parties).