**ANADARKO PETROLEUM CORPORATION,**
Petitioner,

v.

**Phillip THOMPSON, et al., Respondents.**

No. 01–0261.

Supreme Court of Texas.

Argued March 6, 2002.

Decided July 3, 2002.

Opinion Denying Rehearing Jan. 30, 2003.

**21.** 94 S.W.3d at 542.

Eric Anthony Hillerman, Harlow Sprouse, Charles Wade Miller, Sprouse

Smith & Rowley, Amarillo, J. Kyle McClain, Anadarko Petroleum Corp., David M. Gunn, Hogan Dubose & Townsend, L.L.P., Houston, for Petitioner.

Joe L. Lovell, Lovell Lovell & Newsom, Amarillo, Donald M. Hunt, Mullin Hoard Brown Langston Carr Hunt & Joy LLP, Lubbock, J.R. Lovell, Lovell & Lyle, Dumas, for Respondents.

Justice BAKER delivered the opinion of the Court.

In this case, we decide whether a gas mining lease terminated when actual production ceased longer than sixty days. The lease expressly states that it lasts for one year and "as long thereafter as gas is or can be produced." The lease also provides that, if production ceases for any reason, the lease "shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation." The lessees began producing gas in 1936. However, in 1981 and again in 1985, actual production ceased longer than sixty days. The court of appeals held that these cessations terminated the lease. 60 S.W.3d 134, 141. We disagree. We conclude that a well that is capable of production sustains this particular lease even if actual production ceases longer than sixty days. Accordingly, we reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion.

## I. BACKGROUND

In 1936, Thompson's and Anadarko's predecessors entered into a lease "for the purpose of mining and operating for and producing gas." The lease allows either production or the lessees' beginning drilling operations to maintain the lease beyond its one-year primary term.

Two provisions in the lease are pertinent here. The lease's "habendum clause" states:

This lease shall remain in force for a term of one (1) year and as long thereafter as gas is or can be produced.

The lease also has a "cessation-of-production clause," which provides:

If, after the expiration of the primary term of this lease, production on the leased premises shall cease from any cause, this lease shall not terminate provided lessee resumes operations for drilling a well within sixty (60) days from such cessation, and this lease shall remain in force during the prosecution of such operations and if production results therefrom, then as long as production continues.

Anadarko's predecessors began producing gas in 1936. However, it is undisputed that production totally ceased for sixty-one days in 1981 and ninety-one days in 1985 while the gas purchaser conducted pipeline repairs. In 1997, Thompson sued for a declaration that the lease terminated when production ceased in 1981 and for conversion damages.

On Thompson's motion, the trial court granted partial summary judgment that the lease terminated due to one or more cessations of production. After a bench trial, the court rejected Anadarko's affirmative defenses of limitations, laches, quasi-estoppel, unjust enrichment, adverse possession, revivor, judicial estoppel, and promissory estoppel. Accordingly, the trial court awarded damages and attorney's fees to Thompson.

Anadarko appealed. After considering the lease's implicit and explicit objectives, language in the lease's continuous operations clause, and other jurisdictions' case law, the court of appeals construed the lease's habendum clause to require actual production in paying quantities. 60 S.W.3d at 140–41. Accordingly, it affirmed the trial court's partial summary judgment that the lease terminated when

actual production ceased longer than sixty days. 60 S.W.3d at 141. The court of appeals also determined that the evidence supported the trial court's denying Anadarko's affirmative defenses. 60 S.W.3d at 145.

We granted Anadarko's petition to consider whether the court of appeals properly construed the lease to conclude that it terminated.

## II. APPLICABLE LAW

### A. LEASE CONSTRUCTION

Construing an unambiguous lease is a question of law for the Court. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). Accordingly, we review lease-construction questions *de novo. See El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex.1999). In construing an unambiguous lease, our primary duty is to ascertain the parties' intent as expressed within the lease's four corners. *Luckel*, 819 S.W.2d at 461; *see also Yzaguirre v. KCS Resources, Inc.*, 53 S.W.3d 368, 372–73 (Tex.2001). We give the lease's language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions. *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex.1966). We examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent. *Luckel*, 819 S.W.2d at 462. That is because we presume that the parties to a lease intend every clause to have some effect. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). However, we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning. *Fox*, 398 S.W.2d at 92.

### B. OIL AND GAS LEASE PROVISIONS

A Texas mineral lease grants a fee simple determinable to the lessee. *See Texas Co. v. Davis*, 113 Tex. 321, 254 S.W. 304, 309 (1923). Consequently, the lessee's mineral estate may continue indefinitely, as long as the lessee uses the land for its intended purpose. *Davis*, 254 S.W. at 306. However, a mineral estate will automatically terminate if the event upon which it is limited occurs. *Gulf Oil Corp. v. Reid*, 161 Tex. 51, 337 S.W.2d 267, 269 (1960).

A lease's habendum clause defines the mineral estate's duration. *Gulf Oil Corp. v. Southland Royalty Co.*, 496 S.W.2d 547, 552 (Tex.1973). For instance, a typical habendum clause states that the lease lasts for a relatively short fixed term of years (primary term) and then "as long thereafter as oil, gas or other mineral is produced" (secondary term). *See, e.g., Reid*, 337 S.W.2d at 269 n. 1; *see also* 1 SMITH & WEAVER, TEXAS LAW OF OIL & GAS § 4.3 (1996). In Texas, such a habendum clause requires actual production in paying quantities. *Reid*, 337 S.W.2d at 269–70; *Garcia v. King*, 139 Tex. 578, 164 S.W.2d 509, 512 (1942). Thus, a typical Texas lease that lasts "as long as oil or gas is produced" automatically terminates if actual production permanently ceases during the secondary term. *See Amoco Prod. Co. v. Braslau*, 561 S.W.2d 805, 808 (Tex.1978).

Although the habendum clause generally controls the mineral estate's duration, other clauses may extend the habendum clause's term. *Southland Royalty*, 496 S.W.2d at 552. When a lease terminates "is always a question of resolving the intention of the parties from the entire instrument." *Southland Royalty*, 496 S.W.2d at 552.

## III. ANALYSIS

### A. LEASE CONSTRUCTION

Here, we decide whether the lease terminated when actual production ceased

longer than sixty days. Both parties' arguments about what triggers the lease's termination rely upon the lease's habendum and cessation-of-production clauses.

Anadarko contends that the habendum clause's plain language allows production *or the capability of production* to sustain the lease. Thus, Anadarko argues, the court of appeals incorrectly concluded that the habendum clause requires actual production. Anadarko urges us to give the clause's "can be produced" language its full effect. *See Fox,* 398 S.W.2d at 92. According to Anadarko, the cessation-of-production clause does not contradict the habendum clause's plain meaning, because the cessation-of-production clause is a savings provision that only applies if the habendum clause's special limitation occurs and threatens to terminate the lease. In other words, the cessation-of-production clause only applies if the well holding the lease becomes incapable of production. Because the well holding the lease has always been capable of production, Anadarko asks us to reverse the partial summary judgment that the lease terminated due to one or more cessations of production.

In response, Thompson asserts that both the lease's terms and existing Texas law support the court of appeals' conclusion that actual production is required to sustain the lease after the primary term. *See* 60 S.W.3d at 140. According to Thompson, the cessation-of-production clause applies whenever actual production ceases rather than when actual production *and* capability of production cease. Moreover, Thompson argues, allowing the capability of production to sustain the lease indefinitely would render the cessation-of-production clause meaningless.

Here, the habendum clause expressly states that the lease lasts as long as gas "is or can be produced." For several reasons,

the court of appeals rejected Anadarko's argument that capability of production sustained the lease and, instead, concluded that the habendum clause requires actual production. 60 S.W.3d at 140. First, citing *Garcia v. King,* the court of appeals reasoned that the habendum clause must require actual production to further the lease's objective—to reap economic gain. 60 S.W.3d at 140. Second, the court of appeals construed the habendum clause in light of the lease's continuous operations clause, which sustains the lease so long as drilling operations continue "and if production results therefrom, then as long as production continues." *See* 60 S.W.3d at 140. The court of appeals determined that the continuous operations clause shows that the parties intended that "the continuation of actual production was and is necessary to prolong the life of the lessee's interest." 60 S.W.3d at 140. And third, the court of appeals relied on decisions from other jurisdictions that have interpreted similar habendum clauses. 60 S.W.3d at 140 (citing *Greer v. Salmon,* 82 N.M. 245, 479 P.2d 294 (1970); *Fisher v. Grace Petroleum Corp.,* 830 P.2d 1380 (Okla.Ct.App.1991)).

We disagree with the court of appeals' lease construction. Here, neither party contends that the lease is ambiguous. Consequently, in construing the lease, we first consider the parties' intentions as expressed in the lease's four corners. *See Yzaguirre,* 53 S.W.3d at 372–73; *Luckel,* 819 S.W.2d at 461. The habendum clause's plain language shows that the parties intended that a well actually produce gas, *or be capable of producing gas,* to sustain the lease. *See Fox,* 398 S.W.2d at 92. This construction does not conflict with our rule that Texas leases generally require actual production. *See Reid,* 337 S.W.2d at 269–70; *Garcia,* 164 S.W.2d at 512. That is because the cases in which

we recognized the general rule involved leases with typical habendum clauses that sustained the lease as long as oil or gas "is produced." *See Reid*, 337 S.W.2d at 269 n. 1; *Garcia*, 164 S.W.2d at 512. Thus, these cases do not control how to construe a habendum clause that lasts as long as gas "is *or can be* produced."

Additionally, the court of appeals reasoned that allowing the ability to produce gas to prolong the lease would "effectively erase" the cessation-of-production clause from the lease. 60 S.W.3d at 139. But the court of appeals' analysis incorrectly assumes that the cessation-of-production clause is triggered any time actual production stops. Read as a whole, the cessation-of-production clause combines a sixty-day time limit with a resumption of operations provision. Thus, the clause indicates the parties' intent that the cessation-of-production clause apply only when the circumstances require the lessee "to resume operations for drilling a well." In other words, the cessation-of-production clause only applies if a well holding the lease ceases to be *capable of producing gas*. Indeed, in analyzing a similar cessation-of-production clause, one commentator has observed:

> The fact that the event which is designed to prevent termination is the commencement of drilling or reworking operations gives some indication of the purpose of the clause and the intention of the parties. It indicates that the parties are concerned with a situation where cessation of production is of the type that is remedied by drilling or reworking operations. Thus, the parties must have intended that the clause would become operative if a dry well is drilled or if a producing well ceases to be capable of producing in paying quantities. A literal application of the clause to every temporary cessation of produc-

tion could lead to absurd and unintended results.

2 KUNTZ, A TREATISE ON THE LAW OF OIL & GAS 416–17.

Construing the cessation-of-production clause to apply when a well holding the lease ceases to be capable of production—and not simply when actual production ceases—accords with the cessation-of-production clause's plain language. Moreover, this construction avoids imposing an unnecessary limitation on the grant. *See Fox*, 398 S.W.2d at 92. The court of appeals' construction of the cessation-of-production clause would require Anadarko to resume drilling operations within sixty days of any cessation in actual production even if the existing well remained capable of production. Such a construction disregards the habendum clause's "can be produced" language, whereas our construction gives every clause some effect. *See Heritage Res.*, 939 S.W.2d at 121. Accordingly, the court of appeals incorrectly relied upon the cessation-of-production clause to hold that the habendum clause requires actual production to sustain the lease.

The court of appeals also misplaced its reliance on cases from other states. *See* 60 S.W.3d at 140. First, in looking to other states to determine how to interpret the lease here, the court of appeals disregarded our well-established rules about how to interpret oil and gas leases. *See Heritage Res.*, 939 S.W.2d at 121; *Luckel*, 819 S.W.2d at 461–62; *Fox*, 398 S.W.2d at 92. Second, the cases the court of appeals cites actually support our views about this lease. In *Greer*, the New Mexico Supreme Court construed a habendum clause like the one in this case in conjunction with two savings clauses: a cessation-of-production clause and a shut-in royalty clause. *Greer*, 479 P.2d at 296. The New Mexico Court held that a gas well capable of production would only hold the lease if the lessee paid

an annual shut-in royalty. *Greer*, 479 P.2d at 299. Thus, the New Mexico Court relied on provisions within the lease's four corners to ascertain the habendum clause's meaning.

Furthermore, the court of appeals erroneously relied upon an Oklahoma court of appeals opinion to support its view that the Anadarko habendum clause requires actual production. *See Fisher*, 830 P.2d at 1387–88. In relying on *Fisher*, the court of appeals overlooked the fact that the Oklahoma Supreme Court rejected the *Fisher* court's approach. *See Pack v. Santa Fe Minerals*, 869 P.2d 323, 327 (Okla.1994).

In *Pack*, the Oklahoma Supreme Court considered whether a lease held by a gas well capable of production but shut-in for more than sixty days expired under the cessation-of-production clause. *Pack*, 869 P.2d at 325. In construing both clauses, the Oklahoma Supreme Court concluded that the cessation-of-production clause operates as a savings clause and only applies when production—as defined in the habendum clause—ceases. *Pack*, 869 P.2d at 328. "Any other conclusion would render the habendum clause useless after the primary term expires, a conclusion clearly not intended by the parties to the lease." *Pack*, 869 P.2d at 328. Thus, the Oklahoma Supreme Court's analysis supports our viewpoint rather than Thompson's.

Finally, we reject Thompson's contention that allowing the capability of production to sustain the lease would allow the lessees to sustain the lease indefinitely—without actual production. Rather, the implied duty to manage and administer the lease as a reasonably prudent operator, which encompasses the implied duty to market the gas reasonably, would limit the lessees' ability to sustain the lease based on a well's capability of production. *See Yzaguirre*, 53 S.W.3d at 373.

For these reasons, we hold that a well actually producing or capable of producing gas sustains this particular lease under the habendum clause. We also hold that the cessation-of-production clause only applies if the lease would otherwise terminate under the habendum clause. Consequently, the court of appeals erred in holding that, under this lease, "can be produced" means "actual production."

## B. CAPABILITY OF PRODUCTION

Because we conclude that actual production was not necessary to sustain the lease, we next consider whether the 1981 and 1985 cessations terminated the lease. This depends upon whether the well holding the leased premises was capable of production during the two periods when actual production ceased longer than sixty days. According to Anadarko's brief, "[t]he evidence is undisputed here that the well was capable of production during the two periods when no production was shown," because the evidence shows that the well was shut-in for pipeline repairs. In response, Thompson contends that the well was not capable of production, because the well would not have produced if it had been "turned on." *See Hydrocarbon Mgt., Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 433–34 (Tex.App.-Amarillo 1993, no writ).

■ We have determined that "the completion of a gas well capable of producing in paying quantities but shut-in due to lack of pipe line facilities or for other reasons is not considered production" and therefore does not sustain a mineral interest that lasts as long as oil or gas "is produced." *Peveto v. Starkey*, 645 S.W.2d 770, 771 (Tex.1982) (quoting *Midwest Oil Corp. v. Lude*, 376 S.W.2d 18, 20 (Tex.Civ.App.-Corpus Christi 1964, writ ref'd n.r.e.)); *see also Giles v. McKanna*, 200 S.W.2d 709, 712 (Tex.Civ.App.-Austin 1947,

writ ref. n.r.e.) (noting the "marked difference between the capacity to produce in paying quantities and actual production in paying quantities"). However, we have not defined what "capable of production" means.

One court of appeals considered this issue in deciding whether a lessee's paying shut-in royalties maintained a lease even though actual production had ceased. *Hydrocarbon*, 861 S.W.2d at 433–34. In this context, the *Hydrocarbon* court stated:

> We believe that the phrase "capable of production in paying quantities" means a well that will produce in paying quantities if the well is turned "on," and it begins flowing, without additional equipment or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned "on," and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment.

*Hydrocarbon*, 861 S.W.2d at 433–34.

■ We approve the *Hydrocarbon* definition, because it is consistent with existing cases that discuss the difference between actual production and capability of production. *See Peveto*, 645 S.W.2d at 771 (a well is capable of production if it is shut-in because there is no available pipeline); *Stanolind Oil & Gas Co. v. Barnhill*, 107 S.W.2d 746, 749 (Tex.Civ.App.-Amarillo 1937, writ ref'd) (a well is capable of production if it is shut-in because there is no available market); *see also Davis*, 254 S.W. at 309 (a well is incapable of production if the lessee removes the equipment and abandons all efforts to produce); *Pack*, 869 P.2d at 327 (a well is incapable of production if the underlying mineral reserves are depleted). Accordingly, we

hold that a well is capable of production if it is capable of producing in paying quantities without additional equipment or repairs.

## IV. CONCLUSION

Here, the lease's habendum clause expressly states that the lease lasts as long as gas "is or can be produced." Based on the habendum clause's plain meaning, we hold that a well actually producing gas *or capable of producing gas* sustains this particular lease. To be "capable of producing gas," we conclude that a well must be capable of producing gas in paying quantities without additional equipment or repairs. Accordingly, we reverse the court of appeals' judgment and remand to the trial court for further proceedings consistent with this opinion. *See* Tex.R.App. P. 60.2(d). Because we resolve this case based on the lease-construction issue, we do not reach Anadarko's affirmative defenses.

Justice O'NEILL did not participate in this opinion.

## ON MOTION FOR REHEARING

PER CURIAM.

We deny the motion for rehearing but write to clarify our decision.[1]

■ In defining "capable of production" in our original opinion, we approved this definition from *Hydrocarbon Management, Inc. v. Tracker Exploration, Inc.*, 861 S.W.2d 427, 433–34 (Tex.App.-Amarillo 1993, no pet.):

> We believe that the phrase "capable of production in paying quantities" means a well that will produce in paying quantities if the well is turned "on," and it begins flowing, without additional equip-

---

1. Justice Baker, author of the Court's original opinion, resigned effective August 31, 2002, and therefore did not participate on rehearing.

ment or repair. Conversely, a well would not be capable of producing in paying quantities if the well switch were turned "on," and the well did not flow, because of mechanical problems or because the well needs rods, tubing, or pumping equipment.

94 S.W.3d 550, 557. In so doing, we did not overrule or otherwise call into question our prior decisions regarding the proper interpretation of "production in paying quantities." Specifically, we did not overrule or modify the longstanding requirement that for a well to produce in paying quantities, or to be capable of producing in paying quantities, there must be facilities located near enough to the well that it would be economically feasible to establish a connection so that production could be marketed at a profit. As we explained in *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 691 (Tex.1959), all the relevant circumstances must be considered in determining whether there are "paying quantities":

> In the case of a marginal well, such as we have here, the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.
>
> . . . .
>
> The term "paying quantities" involves not only the amount of production, but also the ability to market the product (gas) at a profit. Whether there is a reasonable basis for the expectation of profitable returns from the well is the test. If the quantity be sufficient to warrant the use of the gas in the market, and the income therefrom is in excess of the actual marketing cost, and

operating costs, the production satisfies the term "in paying quantities". In the *Hanks* case, [24 S.W.2d 5, 6 (Tex. Comm'n App.1930, judgm't adopted)], the trial court found that the well completed by Hanks did not produce in paying quantities within the contemplation of the terms of the lease, and this Court upheld such finding, holding that there was no evidence showing that there were any facilities for marketing the gas or any near-by localities or industries which might have furnished a profitable market therefor. The Court went further and pointed out the complete failure of the evidence to show what the gas could have been sold for at any probable market, and that there was no evidence "tending to show that the well was situated in such proximity to any prospective market which would justify the construction of a pipe line for marketing same."

*Id.* at 691 (quoting *Hanks v. Magnolia Petroleum Co.,* 24 S.W.2d 5, 6 (Tex. Comm'n App.1930, judgm't adopted)) (citations omitted); *see also Stanolind Oil & Gas Co. v. Barnhill,* 107 S.W.2d 746, 749 (Tex.Civ.App.-Amarillo 1937, writ ref'd). In the case before us today, the well was connected to pipeline facilities, and there was no question that it was capable of producing in paying quantities even though there were periods during which there was no production.

In our original opinion in this case, we also said,

we reject Thompson's contention that allowing the capability of production to sustain the lease would allow the lessees to sustain the lease indefinitely—without actual production. Rather, the implied duty to manage and administer the lease as a reasonably prudent operator, which encompasses the implied duty to market the gas reasonably, would limit the les-

sees' ability to sustain the lease based on a well's capability of production.

94 S.W.3d at 557–58. But we did not intend to imply that the remedy for breach of an implied covenant to market production would be forfeiture or termination of a lease because we have consistently held that breach of an implied covenant in an oil and gas lease "does not automatically terminate the estate, but instead subjects the breaching party to liability for monetary damages, or in extraordinary circumstances, the remedy of a conditional decree of cancellation." *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex.1989); *see also Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 767–68 (Tex.1994); *Stanolind*, 107 S.W.2d at 748 (holding that "the failure of the lessee further to develop the property is, under the holdings of the courts, a breach of an implied covenant, the usual remedy for which is an action in damages"); *W.T. Waggoner Estate v. Sigler Oil Co.*, 118 Tex. 509, 19 S.W.2d 27, 32 (Tex.1929) (refusing "to treat as a limitation or as a condition subsequent the implied covenant for reasonable development of premises leased for the mining of oil and gas"); *Mon–Tex Corp. v. Poteet*, 118 Tex. 546, 19 S.W.2d 32, 34 (Tex.1929) (holding that a lease did not terminate when an implied covenant was breached but that there would be liability for damages sustained); *Tex. Co. v. Davis*, 113 Tex. 321, 254 S.W. 304, 308 (Tex.1923) (reiterating that the implied covenant to explore and produce is not a condition subsequent that would give rise to the lease's termination if breached). The rationale for these holdings is to promote greater certainty about the continued existence of a lease:

> [I]f reasonable diligence in performing every one of the lessee's exploring, developing, producing, and marketing operations was the test, neither lessor nor lessee could at any time have clearly or certainly known whether the estate

granted was alive or ended. Such a test must inevitably diminish—if not destroy—the value of the rights of all parties derived from a mineral lease.

*W.T. Waggoner Estate*, 19 S.W.2d at 30–31.

We meant in our original decision that, as a practical matter, a lessee will not sustain a lease based on a well's capability of production without actual production of the well because the payment of damages for the failure to reasonably market the gas would be a strong incentive to connect the well to facilities that would permit actual production. And, in an extraordinary case, when damages would not furnish an adequate remedy, a court could conditionally order termination if a connection and actual production were not commenced within a reasonable time. *See id.* at 32.

■ Finally, the motion for rehearing contends that several decisions of this Court and other courts compel a different result in this case. We disagree. The cases on which Thompson and the other Respondents rely are distinguishable because they involved different lease provisions, different facts, or both. The leases at issue in many of the cases said that the lease would remain in effect as long as oil or gas "is produced." *See Haby v. Stanolind Oil & Gas Co.*, 228 F.2d 298, 301 (5th Cir.1955); *Samano v. Sun Oil Co.*, 621 S.W.2d 580, 581 (Tex.1981); *Francis v. Pritchett*, 278 S.W.2d 288, 289 (Tex.Civ. App.-El Paso 1955, writ ref'd); *Sunray DX Oil Co. v. Texaco, Inc.*, 417 S.W.2d 424, 426–27 (Tex.Civ.App.-El Paso 1967, writ ref'd n.r.e.); *Woodson Oil Co. v. Pruett*, 281 S.W.2d 159, 162 (Tex.Civ.App.-San Antonio 1955, writ ref'd n.r.e.); *Hall v. McWilliams*, 404 S.W.2d 606, 607 (Tex.Civ. App.-Austin 1966, writ ref'd n.r.e.); *Wainwright v. Wainwright*, 359 S.W.2d 628, 629 (Tex.Civ.App.-Fort Worth 1962, writ ref'd n.r.e.). But in this case, the lease said "is

or can be produced." As we explained in our original opinion, "can be produced" does not mean actual production.

Only two decisions relied on by Thompson and the other Respondents involved leases that contained a "can be produced" provision. *Davis,* 254 S.W. at 305; *Hanks,* 24 S.W.2d at 7, *affirming Hanks v. Magnolia Petroleum Co.,* 14 S.W.2d 348, 349 (Tex.Civ.App.-Eastland 1929). But the facts were very different from the facts in the case before us today. In *Davis,* the lessee abandoned all operations on the lease after the wells it had drilled ceased to produce, and there was no production for about fourteen years. 254 S.W. at 305. There was also evidence that the lessee had expressly released the lease. *Id.* This Court held the lease had terminated. *Id.* at 309. In *Hanks,* the lessee drilled a successful well and then capped it. 24 S.W.2d at 5. The court held that there was no evidence that the well could produce in paying quantities because "[t]he record is wholly devoid of evidence showing that there were any facilities for marketing the gas or any nearby localities or industries which might have furnished a profitable market therefor," and "[n]o attempt was made to show what the gas could have been sold for at any probable market, nor was there any evidence tending to show that the well was situated in such proximity to any prospective market which would justify the construction of a pipe line for marketing same." *Id.* at 6. As noted above, that is not the situation in this case.

Accordingly, we deny the motion for rehearing.

Justice O'NEILL, Justice SMITH and Justice WAINWRIGHT did not participate in the decision on rehearing.