COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



HJSA NO. 3, LIMITED PARTNERSHIP, §

Appellant, §

v. §

SUNDOWN ENERGY LP, SMC 2000 LP, §
PGP HOLDINGS 1, LLC, SMITH
ALLEN OIL & GAS, LLP, §
TRANSMOUNTAIN EXPLORATION
LLC, FORTUNE NATURAL §
RESOURCES CORPORATION, TEXAS
HEAT OF THE PERMIAN BASIN, INC., §
WHITING OIL AND GAS
CORPORATION, EAGLE ROCK §
ACQUISITION PARTNERSHIP II, LP,
ODYSSEY ROYALTIES, LLC, §
HORIZON ROYALTIES LLC,
PINECONE RESOURCES LLC, §
BRENDA DORMAN FAUGHT, and
LENA RENEE BRIGMAN, §

Appellees. §

No. 08-18-00113-CV

Appeal from the

143rd District Court

of Ward County, Texas

(TC# 16-05-23886-CVW)

# **O P I N I O N**

Appellant HJSA No.3, Limited Partnership appeals partial summary judgment granted

against it on the interpretation of a contractual provision in an oil and gas lease. In his first three

1

issues, HJSA contends: the trial court erred in concluding as a matter of law that the unambiguous terms of the contract allowed Appellees to maintain the lease under the continuous-drilling-program provision of Paragraph 7(b) by conducting "drilling operations" as that term is defined in Paragraph 18 of the lease, instead of deferring to the specific obligations of Paragraph 7(b); in its fourth issue, HJSA contends the trial court erred as a matter of law in striking portions of an affidavit by the attorney who negotiated the original lease because the stricken portions informed, rather than varied or contradicted, the terms of the lease; and in its fifth and final issue, HJSA contends the trial court's construction of the lease leads to an absurd result. For the following reasons, we reverse the decision of the trial court and remand the cause to that court for further proceedings.

## BACKGROUND

This case involves the interpretation of a continuous-drilling program in an oil and gas lease and whether the provision operated as a special limitation. Appellant HJSA No. 3, Limited Partnership is a successor in interest to a mineral estate underlying a 30,450-acre tract of land in Ward County, Texas. From 1925 until 2000, the entire tract was held by a fixed-term lease to Gulf Production Co., whose successor was Chevron U.S.A., Inc. The terms of the lease provided it would terminate automatically on August 4, 2000. In 1995, the prior mineral-estate owners negotiated a top lease with Penwell Energy, Inc. Appellee Sundown Energy LP and its co-appellees are the successors in interest to the Penwell Energy lease. The effective date for the top lease was August 4, 2000—the day the Chevron lease terminated—and like the prior lease it covered the entire 30,450-acre tract.

The lease provided Sundown with a six-year grace period during which the lease would be

2

maintained as to the entire tract provided oil and gas was being produced in paying quantities from

anywhere on the leased premises. But at the end of the six years the lease could be maintained

only if there was production in paying quantities from each individual tract or if Sundown was

engaged in a "continuous drilling program." The relevant language from the lease is as follows:

7. Reassignment Obligations: Continuous Drilling

(a) This lease shall continue for so long as oil and gas is produced from the Leased Premises in paying quantities, subject to the reassignment provisions set forth below. In the period from the Effective Date until the sixth anniversary of the Effective Date, production of Oil and Gas in paying quantities from anywhere on the Leased Premises shall extend the entire lease without any reassignment obligation. *After the sixth anniversary of the Effective Date, and subject to the provisions of Paragraph 7(b), Lessee shall reassign to Lessor or Lessor's designee, all of Lessee's operating rights in all tracts of the lease not then held by production*, retaining only the right to remove equipment and the nonexclusive right to continue to use the surface of the reassigned tract in connection with Lessee's operations on the remainder of the Lease. As used in this Paragraph 7(a), a tract of the Lease is held by production so long as a well is producing Oil and/or Gas in paying quantities from the tract (subject to the provisions of Paragraphs 3.10, 6 and 12); provided, however[] that the Chevron Producing Area and the 3-B Producing Area shall each separately constitute single tracts, and the tracts of land that can be held outside the Producing Areas by production from a single well shall be limited in area and depth as follows (the Production Units):

.            .            .

(b) The obligation in Paragraph 7(a) above to reassign tracts not held by production shall be delayed for so long as Lessee is engaged in a *continuous drilling program* on that part of the Leased Premises outside of the Producing Areas. *The first such continuous development well shall be spudded-in on or before the sixth anniversary of the Effective Date, with no more than 120 days to elapse between completion or abandonment of operations on one well and commencement of drilling operations on the next ensuing well*. The obligation to reassign tracts not held by production provided in Paragraph 7(a) above shall be deemed to be effective upon the cessation of the last continuous drilling operation, unless Lessee is not conducting drilling operations on the sixth anniversary of Effective Date, in which event such reassignment obligation shall be deemed to be effective upon the expiration of the sixth anniversary of Effective Date. Within one hundred twenty (120) days after the sixth

3

anniversary of Effective Date or after the cessation of continuous drilling operations, whichever occurs later, Lessee shall designate Production Units in writing in recordable form and deliver same to Lessor, with an adequate legal description and with the producing stratum or strata defined with particularity by reference to Lessee's well logs.   [Emphasis added].

The lease also provided that in the event of a temporary cessation of production the lease could be maintained by "commenc[ing] drilling operations as defined herein" within ninety days if the operations subsequently resulted in restoration of production in paying quantities.   This temporary cessation clause stated it was subject to the reassignment obligations of Paragraph 7.   The term "drilling operations," is defined in Paragraph 18 of the lease:

Whenever used in this lease the term 'drilling operations' shall mean: actual operations for drilling, testing, completing and equipping a well (spud in with equipment capable of drilling to Lessee's object depth); reworking operations, including fracturing and acidizing; and reconditioning, deepening, plugging back, cleaning out, repairing or testing of a well.

The lease was executed, and Sundown began drilling the first new well in February 2006.   In total, Sundown spudded-in[1] and drilled fourteen development wells from February 2006 to March 2015. But on January 29, 2016, HJSA sent a letter to Sundown notifying it that the lease had terminated as to certain portions of the leased property due to its failure to engage in a continuous drilling program as defined in the lease.   It asserted that from July 2007 through July 2013, Sundown had on five separate occasions[2] allowed more than 120 days to elapse between completion or abandonment of operations on one well and commencement of drilling operations on the next ensuing well, thereby failing to maintain the lease as to the areas not held by production.   HJSA contended Paragraph 7 of the lease required Sundown to spud-in and drill a new well outside of

---

[1]  "Spudding-in" is a term of art in the oil and gas industry meaning "[t]he first boring of the hole in the drilling of an oil well."   *See* P. Martin and B. Kramer, *Williams & Meyers - Manual of Oil and Gas Terms*, 1007 (16th ed. 2015).

[2]  HJSA later added a sixth instance in its amended petition.

4

the producing areas within 120 days of completion or abandonment of a spudded-in and drilled well. Sundown countered that while no new wells had been spudded-in during the periods described by HJSA, it had conducted reworking and reconditioning operations on existing wells. Because Paragraph 18's definition of drilling operations included reworking and reconditioning, they contended their actions had maintained the lease.

HJSA filed suit in May 2016. Each side filed motions for summary judgment and partial summary judgment and a hearing on the motions was held in November 2017. The trial court granted partial summary judgment to Sundown, finding that the unambiguous terms of the lease allowed Sundown to maintain the lease by conducting drilling operations as that term was defined in Paragraph 18 of the lease, and that Sundown's reworking and reconditioning of existing wells had maintained the contested areas of the leased premises. We granted HJSA's petition for permissive appeal.

## DISCUSSION

### Construction of the Oil and Gas Lease

The subject of this dispute is whether the term "drilling operations" as used in Paragraph 7(b) of the lease is modified in the specific context of that paragraph. HJSA contends references in Paragraph 7(b) to "continuous drilling program," "continuous development well," "spudded-in," and "next ensuing well," all clarify that in the context of Paragraph 7(b), Sundown was required to spud-in a new well in a non-producing area within 120 days of completion or abandonment of a prior well to maintain the lease in the areas not held by production. Sundown argues the definition in Paragraph 18 controls and should be plugged-in to paragraph 7(b). Under that reading, the actions taken by Sundown during the alleged lapses maintained the lease as to the

5

entire tract.

## *Standard of Review*

We review a trial court's grant of summary judgment *de novo*. *Provident Life and Acc. Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). The construction of an unambiguous contract is a question of law, which we also review *de novo*. *Anderson Energy Corp. v. Dominion Okla. Tex. Expl. & Prod., Inc.*, 469 S.W.3d 280, 287 (Tex.App.—San Antonio 2015, no pet.)(*citing MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999)). A contract is unambiguous if, as worded, it can be given a clear and definite legal meaning so that it can be construed as a matter of law. *Id.*, (*citing GilbertTex. Contr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010)); *see also Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996)("An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract."). A contract is ambiguous only if it is subject to more than one reasonable interpretation after applying the relevant rules of construction, which creates a fact issue on the parties' intent. *In re D. Wilson Const. Co.*, 196 S.W.3d 774, 781 (Tex. 2006). In determining whether a contract is ambiguous, we consider the contract as a whole in light of the circumstances present when the contract was entered. *Columbia Gas Transmission Corp.*, 940 S.W.2d at 589; *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). If we determine the contract is not ambiguous, our primary duty as a reviewing court is to give effect to the written expression of the parties' intent. *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994).

Parol evidence is inadmissible for the purpose of creating an ambiguity. *CBI Indus., Inc.*, 907 S.W.2d at 520. Only where a reviewing court has first determined a contract is ambiguous

may it consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *Id.* A "patent" ambiguity is one that is apparent from the face of the contract. *Fox v. Parker*, 98 S.W.3d 713, 719 (Tex.App.—Waco 2003, pet. denied)(*citing CBI Indus., Inc.*, 907 S.W.2d at 520). A "latent" ambiguity arises when a contract that appears unambiguous is applied to its subject matter and an ambiguity appears. *Id.* If either a patent or latent ambiguity is found, the court's duty is to determine the true intentions of the parties, and parol evidence may be reviewed to determine that intent. *Id.*

### *Applicable Law*

Mineral leases are contracts, and their terms define the parties' respective rights and duties. *Endeavor Energy Res., L.P. v. Discovery Operating, Inc.*, 554 S.W.3d 586, 595 (Tex. 2018). Texas has a strong public policy favoring freedom of contract, and courts must respect and enforce the terms of a contract that the parties have agreed on unless there are compelling reasons not to do so. *Phila. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016). When construing contract provisions, controlling effect must be given to specific provisions over general provisions. *Young Mens Christian Ass'n of Greater El Paso v. Garcia*, 361 S.W.3d 123, 127 (Tex.App.—El Paso 2011, no pet.).

Generally, a mineral lease's habendum clause divides a lease's duration into two parts: a primary term and a secondary term. *Endeavor Energy Res., L.P.*, 554 S.W.3d at 597 (*citing Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)). Usually, the primary term will last for a fixed period of time; the secondary term will then continue the lease after the primary term for only so long as oil and gas continue to be produced. *Id.* The lease will automatically terminate if production permanently ceases during a secondary term. *Id.* But as

7

long as one portion of the leased tract, no matter how small, is producing oil or gas, the lease will continue as to the entire tract. *Id.*

Lessors typically do not desire that an operator be allowed to maintain an entire tract by producing from a small area of a large tract; the lessor's priority is usually to have the operator fully develop the leased area and thus maximize his royalty payments. *Endeavor Energy Res., L.P.*, 554 S.W.3d at 597. An operator, on the other hand, may want to delay drilling or production for any number of reasons convenient to it, such as superior market conditions for the minerals being extracted. *Id.* Continuous-development clauses permit a balancing of these competing interests by "permit[ing] a lease to be preserved under certain circumstances even though there is no production after the expiration of the primary term during *continuous* drilling operations, whether on the same or different wells." [Emphasis in orig.]. *Id.*, (*quoting* 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law: Manual of Oil and Gas Terms* 951, § 617 (LexisNexis Matthew Bender 2017)). Generally, these clauses continue the lease beyond the expiration of the primary term if production results from the operations being engaged in by the lessees when the primary term expires, provided the development efforts are continuous with no gap. *Id.*, (*citing Rogers v. Osborn*, 152 Tex. 540, 261 S.W.2d 311, 315 (1953)(Wilson, J., concurring)).

Continuous-development clauses frequently work together with retained-acreage clauses. *Endeavor Energy Res., L.P.*, 554 S.W.3d at 597. "While a habendum clause generally extends the entire lease so long as some production is occurring on the lease, and a continuous-development clause further extends the entire lease so long as the operator remains engaged in the required development efforts, a retained-acreage clause typically divides the leased acreage such that

8

production or development will preserve the lease only as to a specified portion of the leased acreage." *Id.*, at 597–98. If a lessor wants to have its entire leasehold acreage developed, a retained-acreage clause is the ideal choice to accomplish that goal. *Id.*, at 598. Retained-acreage clauses are as various as the oil and gas leases they are found in, and the effect of a particular retained-acreage clause depends entirely on the terms freely chosen by the parties. *Id.*

A forfeiture cuts short the natural limit of a leasehold interest, and generally arises from the failure to comply with a condition subsequent. *Endeavor Energy Res., L.P.*, 554 S.W.3d at 606 n.14. Forfeitures are disfavored in Texas, and contracts are construed to avoid them. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009). A special limitation, by contrast, provides that a lease will automatically terminate upon the happening of a stipulated event. *Endeavor Energy Res., L.P.*, 554 S.W.3d at 606. The event may be, among other things, a cessation of production or failure to commence drilling or reworking operations. *Id.* While we will construe contracts to avoid forfeitures, a special limitation does not result in a forfeiture—it results in a termination of all or part of the lease under its own terms. *Id.* We will not find that the contract's language creates a special limitation, however, "unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Thompson*, 94 S.W.3d at 554 (*citing Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)).

We acknowledge the well-recognized canon of construction that "technical words are to be interpreted as usually understood by persons in the business to which they relate, unless there is evidence that the words were used in a different sense." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 211 (Tex. 2011)(*citing Barrett v. Ferrell*, 550 S.W.2d 138, 142 (Tex.Civ.App.—Tyler 1977, writ ref'd n.r.e.)). Courts should harmonize all the provisions of a

9

contract so that none are rendered meaningless. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005).

## *Analysis*

### *Special Limitation*

At the outset, we must determine whether Paragraph 7(b) operates as a special limitation. Sundown contends that 7(b) does not create a special limitation, or at least does not create the special limitation claimed by HJSA. Paragraph 7(b) states, "The obligation in Paragraph 7(a) above to reassign tracts not held by production shall be delayed *for so long as Lessee is engaged in a continuous drilling program* on that part of the Leased Premises outside of the Producing Areas." [Emphasis added]. Paragraph 7(a) states: "This lease shall continue *for so long as oil and gas is produced* from the Leased Premises in paying quantities, *subject to the reassignment provisions set forth below.*" [Emphasis added]. This language states the lease will terminate upon the happening of a stipulated event—the cessation of production in paying quantities. The language in Paragraph 7(b) also provides that the lease will terminate when lessee ceases to be engaged in a continuous drilling program. The "for so long as" language fixes a natural limit to the lease, and thus unequivocally creates a special limitation because it does not serve to cut short the natural limit of the lease, as would a forfeiture. *Endeavor Energy Res., L.P.*, 554 S.W.3d at 606; *see Lynch v. Southern Coast Drilling Co.*, 442 S.W.2d 804, 806 (Tex.Civ.App.—San Antonio 1969, no writ)(stating it is well settled in Texas that a provision in an oil and gas lease stating that the lease shall continue after the primary term for so long as oil or gas is produced is a special limitation). Accordingly, Paragraph 7(b) creates a special limitation fixing one of the limits of the lease. Sundown's alternative contention that even if a special limitation was created it was

10

not triggered by its failure to spud-in new wells during the alleged lapses in the continuous drilling program depends on our construction of the contract, which will be addressed in the next section.

*The Continuous Drilling Program*

The crux of this dispute is what type of "drilling operations," as that term is used in Paragraph 7(b), qualified as "continuous drilling operations" serving to extend the lease as to all tracts not held by production. As a preliminary matter, as both parties agree, the contract is capable of being given a clear and definite legal meaning as written and is therefore unambiguous. *Anderson Energy Corp.*, 469 S.W.3d at 287. The section at issue plainly states what was required to maintain the lease under the continuous drilling program:

> The obligation in Paragraph 7(a) above to reassign tracts not held by production shall be delayed *for so long as Lessee is engaged in a continuous drilling program* on that part of the Leased Premises outside of the Producing Areas. The *first such continuous development well* shall be spudded-in on or before the sixth anniversary of the Effective Date, with no more than 120 days to elapse between completion or abandonment of operations on one well and *commencement of drilling operations on the next ensuing well*. [Emphasis added].

The paragraph requires that the lessee be engaged in a "continuous drilling program" to maintain the lease as to areas not held by production. It then describes what that program is—the spudding-in of the first *such* continuous development well, and not more than 120 days elapsing between abandonment of one well and commencement of drilling operations on the *next ensuing well*. "Such" is defined as "of the same class, type, or sort." *Such*, Merriam Webster's Collegiate Dictionary (10th ed. 1997). "Ensuing" means "to take place afterward or as a result." *Ensue*, Merriam Webster's Collegiate Dictionary (10th ed. 1997). Thus, the first of the continuous development wells, which are necessarily all of the same type due to the use of "such" in reference to them, must be spudded-in. Drilling operations then must commence on the next resulting

11

well—a continuous development well—within 120 days of the completion or abandonment of a prior well. Sundown argues that the definition of "drilling operations" given in paragraph 18 must be read into this paragraph to give it the meaning intended by the parties. Paragraph 18 defines "drilling operations" as follows:

> Whenever used in this lease the term 'drilling operations' shall mean: actual operations for drilling, testing, completing and equipping a well (spud in with equipment capable of drilling to Lessee's object depth); reworking operations, including fracturing and acidizing; and reconditioning, deepening, plugging back, cleaning out, repairing or testing of a well.

Sundown contends the definition agreed to by the parties allowed it to continue the lease by performing any of the three defined varieties of drilling operations on the next ensuing well: (1) spudding-in a new well, (2) reworking operations on an existing well, or (3) reconditioning, deepening, plugging back, cleaning out, or repairing or testing an existing well. As for the requirement that these operations be performed on the "next ensuing well," Sundown asserts this does not mean "next new well," but simply means on the next well on which any of the three varieties of drilling operations occur. HJSA, on the other hand, argues that Paragraph 7(b) is a specific provision, and that the obligations of that paragraph required Sundown to engage in a continuous drilling program by spudding-in a new well on an undeveloped area within 120 days of abandoning a prior well to maintain the lease. It contends the term "drilling operations" was modified by "on the next ensuing well," and by the other provisions of Paragraph 7(b) referring to "continuous drilling program," "continuous development well," and "spudding-in," thus precluding the work and repair definitions from Paragraph 18 from operating to extend the lease.

A similar dispute over the interpretation of an oil and gas lease was addressed by the Supreme Court in *Exxon Corp. v. Emerald Oil & Gas Co., L.C.* In that case, the royalty owners

12

and the current lessee sued the previous lessee, Exxon Corporation, claiming it had failed to fully develop oil and gas tracts under the lease and had sabotaged the wells before abandoning the lease. *Exxon Corp.*, 348 S.W.3d at 198. Exxon acquired the lease in the 1950s, but in the 1970s began trying to renegotiate a lower royalty payment from the royalty owners, alleging the lease was no longer profitable due to the high royalty payments. *Id.*, at 199. When negotiations failed, Exxon began plugging all of the producing wells in operation. *Id.*, at 200. The royalty owners sued for, among other causes, breach of contract for Exxon's alleged failure to "fully develop" the lease as required under the lease's development clause. *Id.*, at 210. Under Article 3(a) of the lease, Exxon was required to "prosecute diligently a continuous drilling and development program until said tract is *fully developed* for oil and gas." [Emphasis in orig.]. *Id.* It then stated that a tract would be deemed "fully developed" when at least one well had been drilled and completed in each horizon capable of producing in paying quantities. *Id.* Article 4 of the lease provided that in each instance the word "diligently" was used in the lease it meant:

> [T]hat degree of action, conduct and effort which is consistent with that which would characterize the action . . . of a prudent and skillful oil operator possessed of ample equipment, material and money . . . and actuated by an honest desire to carry out and fulfill in good faith each and every obligation imposed upon the lessee by this lease.

*Id.*, at 210. Article 4 went on to state that the lessee shall develop the leased premises for the production of oil and gas in accordance with the best practices of the industry, for the purpose of developing "the full value of the leased premises." *Id.*

The royalty owners asserted the language in Article 4 regarding developing the full value of the leased premises, and the accompanying definition of "diligently," was a warranty of a level of production—to produce all oil and gas in each zone for each well that can be produced in paying

13

quantities—that should be read into the term "fully developed" in Article 3(a). *Exxon Corp.*, 348 S.W.3d at 212. Exxon contended that the royalty owners misread the term "fully developed" in Article 3(a) by incorporating the provision of Article 4, which Exxon claimed was a separate covenant that did not define its obligation to develop the lease. *Id.*, at 209. In construing the lease, the Supreme Court concluded that the term "fully developed" in Article 3(a) did not obligate Exxon to produce all oil and gas that could be produced in paying quantities, but by the terms of that paragraph imposed only the duty to drill and complete at least one well "capable" of producing in paying quantities. *Id.*, at 212. The Court concluded that the difference between Article 3(a)'s obligation to fully develop the tracts and Article 4's obligation to realize the full value of the tract was that Article 3(a)'s duty was less onerous and was inconsistent with the duty to fully develop in Article 4. *Id.*, at 214. Article 3(a) was therefore a more specific provision than Article 4 in addressing the development obligations in the lease, and specific provisions control over general provisions concerning the same issue. *Id.*, at 215. To hold Article 4's aspirational and more general duty trumped the defined duty of Article 3(a) would render meaningless Article 3(a)'s specifically defined obligation to "fully develop" as drilling and completing at least one well in each horizon capable of producing in paying quantities. *Id.* The Court concluded its reading harmonized both provisions by giving effect to the parties' expressed intent in Article 3(a) regarding the duty to develop, while the aspirational language in Article 4 informed the duties in Article 3(a) in that they should be performed in accordance with the best practices of the industry with the goal of fully developing the tracts. *Id.*

Similarly, Sundown argues the definition of "drilling operations" in Paragraph 18 controls and should be plugged into Paragraph 7(b)'s requirement that "no more than 120 days [] elapse

14

between completion or abandonment of operations on one well and commencement of drilling operations on the next ensuing well." Sundown argues that the use of the term drilling operations meant that "next ensuing well" meant any well on which any of the three varieties of drilling operations occurred, including already existing wells. But reading the lease in this way would render the "spudded-in" language from the second sentence of Paragraph 7(b) meaningless; if what the parties meant was either spudding-in OR reworking operations, they would not have used spudded-in exclusively, or would have used "drilling operations" in its place. The contract requires that the first *such* well, meaning the first of this type of well that qualifies as part of a continuous drilling program, must be spudded-in. It then refers to commencement of drilling operations on the next ensuing well. If the parties had desired only a single well to be spudded-in, and to then allow drilling operations on any well to maintain the lease, as Sundown claims, they would not have used next ensuing well in the context of the first and subsequent "continuous drilling well." In the context of Paragraph 7(b), "drilling operations" is modified by "continuous drilling program," "continuous development well," "spudded-in," and "next ensuing well," which all clarify that Sundown was required to spud-in a new well in a non-producing area within 120 days of completion or abandonment of a prior well to maintain the lease in the areas not held by production. Because specific provisions control over general provisions, and the duties in Paragraph 7(b) are more specific in addressing the continuous development obligations, the definition of "drilling operations" in Paragraph 18 does not serve to broaden the specific requirements of the continuous development program as defined in Paragraph 7(b). *Exxon Corp.*, 348 S.W.3d at 215; *Garcia*, 361 S.W.3d at 127.

Sundown argues that this reading would render the definition in Paragraph 18 meaningless,

15

and as they correctly point out, courts should not render any provision of a contract meaningless but should seek to harmonize all provisions. *Dorsett*, 164 S.W.3d at 662. But, as in *Exxon Corp.*, the definition in Paragraph 18 informs the duty in Paragraph 7(b) by confirming the duty already independently described in Paragraph 7(b): to spud-in with equipment capable of drilling to Lessee's object depth. Further, the term "drilling operations" as defined in Paragraph 18, with its three-part definition, is not rendered meaningless because it is used elsewhere in the contract in different contexts. Specifically, Paragraph 6, dealing with the temporary cessation of production, expressly contemplates the situation in which the lease can be maintained by conducting "drilling operations" on an already existing well:

> Subject to the provisions of Paragraph 3.10, in the event all production of Oil and Gas from the Leased Premises should at any time . . . cease for any cause other than force majeure, this lease shall terminate unless Lessee in good faith within ninety (90) days commences *drilling operations as defined herein* which thereafter results in the restoration of production in paying quantities or Lessee otherwise restores production in paying quantities . . . . [Emphasis added].

The reference to "drilling operations as defined herein" shows the parties intended that the three-part definition of Paragraph 18 was what was meant by "drilling operations." Indeed, that paragraph specifically contemplates a situation in which production ceases on an existing well or wells, and allows for reworking, reconditioning, deepening, plugging back, cleaning out, or repairing or testing the existing wells that have ceased producing—or the spudding in of a new well—to maintain the lease. Thus, contrary to Sundown's assertion, thus reading does not render Paragraph 18's definition meaningless.

Sundown also contends that the introductory phrase to the definition of "drilling operations" in Paragraph 18, "[w]henever used in this lease," manifested the parties' intent to have that definition plugged-in whenever the term was used. But this is the same argument that was

rejected in *Exxon Corp.*, where the definition of "diligently" was introduced by stating that the definition would apply in each instance the word was used throughout the contract. *Exxon Corp.*, 348 S.W.3d at 210. There, the Court held the definition could not be read-in to impose a greater duty than that specifically defined in the development paragraph. *Id.*, at 212. Here, because the specific duties in Paragraph 7(b) control over the general definition in Paragraph 18, the definition is limited in that context.

Accordingly, under the unambiguous terms of the lease, Sundown was required to engage in a continuous development program to maintain the lease under Paragraph 7(b), and that program required the spudding in of a continuous development well within 120 days of completion or abandonment of a prior well. Issues One, Two, and Three are sustained.

### Extrinsic Evidence and Surrounding Circumstances

In its fourth issue, HJSA contends the trial court erred in striking portions of the affidavit of an attorney who had negotiated the lease, claiming it informed rather than varied or contradicted the contract. Sundown also contends that certain course-of-performance evidence and other extrinsic evidence favor its reading of the contract.

### *Analysis*

Sundown alleges that HJSA accepted payments for years without raising objections to Sundown's failure to spud-in new wells during the breach periods. Our finding that the contract is unambiguous renders these arguments irrelevant because course-of-performance evidence and extrinsic evidence are not considered in construing an unambiguous contract. *Burlington Res. Oil & Gas Co. LP v. Texas Crude Energy, LLC*, 573 S.W.3d 198, 206 (Tex. 2019)("Where contracts are unambiguous, we decline to consider the parties' course of performance to determine its

meanings")(*citing Frost Nat'l Bank v. L & F Distribs., Ltd*, 165 S.W.3d 310, 313 n.3 (Tex. 2005));

*Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 593 (Tex. 1996)(stating

that the Court's conclusion that a contract was unambiguous rendered appellant's contention

regarding extrinsic evidence irrelevant); *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 732 (Tex.

1981)(holding the court of appeals erred in considering extrinsic evidence of the parties'

subsequent conduct in construing unambiguous lease).

   The same holds true for HJSA's contention regarding the affidavit of the attorney who

originally negotiated the lease on its behalf and its discussion of the utilitarian purpose of the

continuous drilling program.   HJSA contends this affidavit should have been admitted because it

informs rather than varies the contract.   While a reviewing court may consider the surrounding

circumstances of the contract, we may only consider objective, not subjective, evidence.   *URI,*

*Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 767 (Tex. 2018)("[E]xtrinsic evidence may be consulted to

give meaning to the phrase 'the green house on Pecan Street,' but 'cannot be used to show the

parties' motives or intentions apart from' the language employed in the contract.")(*quoting Anglo-*

*Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 452 (Tex. 2011));

*Matagorda Cty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex. 2006)("[T]he instrument alone

will be deemed to express the intention of the parties for it is objective, not subjective, intent that

controls.")(*quoting City of Pinehurst. v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.

1968)); *see also Palestine Water Well Serv., Inc. v. Vance Sand & Rock, Inc.*, 188 S.W.3d 321,

325 (Tex.App.—Tyler 2006, no pet.)(stating that in determining whether there was a meeting of

the minds, courts use an objective standard, considering what the parties did and said, not their

subjective states of mind).   The affidavit of the attorney who negotiated the contract for one side

cannot be used to support one party's interpretation of an unambiguous contract by reference to the subjective intent of that party at the time of the contract's execution.   Thus, the trial court did not err in excluding this evidence.   Issue Four is overruled.

Our conclusion makes it unnecessary to address Sundown's fifth issue regarding the trial court's construction of Paragraph 7(b) leading to an absurd result.   *See* TEX.R.APP.P. 47.1.

## CONCLUSION

Having sustained Appellant's first three issues, we reverse the judgment of the trial court granting partial summary judgment for Sundown and denying HJSA's cross motion for partial summary judgment, render judgment under the unambiguous terms of the lease, Sundown was required to engage in a continuous development program to maintain the lease under Paragraph 7(b), and that program required the spudding in of a continuous development well within 120 days of completion or abandonment of a prior well; affirm the part of the trial court's judgment regarding the exclusion of extrinsic evidence; and remand the cause to the trial court for further proceedings.


August 16, 2019

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.
Palafox, J., Dissenting